53 Mass. App. Ct. 11 (2001)                                   11

Netherwood *v.* American Federation of State, County & Municipal Employees, Local 1725.

FRANCIS D. NETHERWOOD & others[1] *vs.* AMERICAN
FEDERATION OF STATE, COUNTY & MUNICIPAL EMPLOYEES,
LOCAL 1725, & another.[2]

No. 99-P-607.

Hampden. May 3, 2001. - October 19, 2001.

Present: LENK, GELINAS, & KAFKER, JJ.

*Libel and Slander. Constitutional Law,* Libel and slander. *Malice. Contract,*
Interference with contractual relations. *School and School District. Words,*
"Actual malice," "Public official."

A Superior Court judge properly concluded that a plaintiff, the director of
maintenance and transportation for a school district, was, for purposes of a
defamation action, a "public official" by virtue of the scope of his duties,
the level of his compensation, the continuing public debate about his job
performance, and the impact of his job performance on the students, faculty,
and employees of the school district [15-18]; accordingly, where the
plaintiff failed to show an ability to prove at trial by clear and convincing
evidence that the defendant newspaper had published the allegedly
defamatory statements with actual malice, the judge properly granted sum-
mary judgment in favor of the defendant [18-20].
At the trial of a claim alleging interference with contractual relations, in
which the evidence was insufficient to permit a reasonable conclusion that
the nonrenewal of the plaintiff's contract with a third party resulted from
the actions of the defendant, the judge correctly granted the defendant's
motion for judgment notwithstanding the verdict. [21-22]
Where the plaintiff in a defamation action failed to demonstrate that the alleg-
edly defamatory statements, made in the context of a labor dispute, were
published with actual malice, the trial judge properly granted the motion of
the defendant newspaper for judgment notwithstanding the verdict. [22-23]

CIVIL ACTION commenced in the Superior Court Department on
February 18, 1993.

Claims against the defendant The Republican Company were
heard by *Constance M. Sweeney,* J., on a motion for summary

[1]Nancy L., Andrew P., Jeffrey R., and Laura C. Netherwood.
[2]The Republican Company.

judgment; claims against the defendant American Federation of State, County and Municipal Employees, Local 1725, were tried before *Francis R. Fecteau,* J., and motions for judgment notwithstanding the verdict and for a new trial were heard by him.

*Frank R. Saia* for the plaintiffs.

*Joseph P. Pessolano* for The Republican Company.

*Steven A. Torres* for American Federation of State, County and Municipal Employees, Local 1725.

LENK, J. The plaintiff, Francis D. Netherwood, was from 1989 until 1992 the director of maintenance and transportation for the Amherst-Pelham Regional School District (school district). He and his immediate family brought this action in 1993 against seven parties[3] in connection with events leading up to the non-renewal of his annual contract with the school district. As relevant to this appeal, the defendants are The Republican Company, publisher of the Union-News, a local daily newspaper (newspaper), and a labor union, the American Federation of State, County and Municipal Employees, Local 1725 (AFSCME or union).

Netherwood alleged that, in four articles appearing on June 19, 26, and 27, and on July 2, 1992, the newspaper libeled him. A Superior Court judge subsequently allowed the newspaper's motion for summary judgment. Netherwood alleged also in his complaint that AFSCME, and Jonathan Tuttle, its business agent, defamed him and interfered with his contractual or advantageous relationship with the school district by communicating unfounded employee complaints to the superintendent of the school district. Those claims were tried to a jury who returned a verdict on special questions for Netherwood on his claim against AFSCME, awarding him $58,000.00 on the defamation claim and $1,000.00 on the interference claim. The jury, however, found for Tuttle on both of the claims brought against him. Thereafter, AFSCME moved pursuant to Mass.R.Civ.P. 50(b),

[3]Amherst-Pelham Regional School District, Amherst-Pelham Regional School Committee, Superintendent Gus Sayer, American Federation of State, County and Municipal Employees, Local 1725 (AFSCME), Jonathan Tuttle, individually and as agent of AFSCME, The Republican Company, and attorney William Volk.

365 Mass. 814 (1974), for judgment notwithstanding the verdict (judgment n.o.v.), and, pursuant to rules 50(c) and 59(a), 365 Mass. 815, 827 (1974), for a new trial. The trial judge entered judgments n.o.v. for AFSCME and, in the event of reversal on appeal, conditionally granted AFSCME's motion for new trial. Netherwood appeals from both rulings in favor of AFSCME as well as from the allowance of the newspaper's summary judgment motion.

I. *Background.* Although we look solely to the materials before the motion judge when reviewing the propriety of her allowance of the newspaper's summary judgment motion, and solely to the evidence at trial when reviewing the trial judge's rulings on AFSCME's motions for judgment n.o.v. and for a new trial, we recite chronologically those facts helpful to an understanding of Netherwood's claims against the union, Tuttle, and the newspaper.

Netherwood assumed his duties as director of maintenance and transportation for the school district in September, 1989. His contract was subject to annual renewal and was renewed twice, for the school years that began in September, 1990, and September, 1991. Following a meeting with certain union members, Tuttle wrote and sent a letter on December 2, 1991, to Gus Sayer, the superintendent of the school district. The letter stated, in substance, that a number of individuals had approached the union with concerns about Netherwood's "inappropriate behavior," including discrimination, coercion, verbal abuse, and the creation of an intimidating and sexually charged environment. Tuttle characterized the allegations as "actionable and credible at the M.C.A.D. and the L.R.C.,"[4] but indicated that he would not file any action without providing the school district an opportunity to investigate. Sayer, the superintendent, responded to Tuttle that he could not proceed on the basis of anonymous complaints; the two later met and Tuttle provided Sayer with the names of complainants. Tuttle and AFSCME apparently played no further role, although certain union members, including those elected to union office, were among the complainants.

---

[4]Massachusetts Commission Against Discrimination, and Labor Relations Commission, respectively.

Sayer informed Netherwood of the complaints and of his intention to conduct an investigation that would include Sayer's meeting individually with the complaining employees. Netherwood pursued a grievance[5] as to this procedure under the terms of his union's collective bargaining agreement with the school district, maintaining that the appropriate approach was not for Sayer to investigate but for the disgruntled employees each to pursue individual grievances under the terms of their union's collective bargaining agreement with the school district.

In any event, Sayer conducted the investigation and, on February 18, 1992, gave Netherwood a memorandum summarizing the complaints which Sayer characterized as "credible." Sayer asked Netherwood to create a plan to address the issues raised. Netherwood did so but, upon his return from sick leave, learned that Sayer thought the plan inadequate to address the loss of confidence existing in Netherwood's department. Following an April 14, 1992, school committee meeting, Netherwood's contract was not renewed.

Certain of the school district's current and former employees had in the meanwhile hired their own attorney, William Volk.[6] On April 27, 1992, Volk sent a letter to the chair of the school district's board of education in which he claimed to represent thirty-five present and former employees who had complaints against Netherwood that included sexual harassment, invasion of privacy, and the endangerment of employee safety. The letter was apparently forwarded to Sayer, who responded to it in a May 11, 1992, letter, to which Volk wrote in reply on May 14, 1992, agreeing to forestall taking any action so long as he would be notified in advance if the school committee were to plan a vote on Netherwood's reappointment.

The substance of Volk's letters was later reported in four newspaper articles. The articles were written by two different reporters: Wesley Blixt wrote the article appearing on June 19, 1992, while Michael Plaisance wrote the June 26 and 27, and

---

[5]Netherwood was a member of the Amherst-Pelham Administrators Association (APAA).

[6]Nothing in the record suggests that Volk had any affiliation or relationship with AFSCME, nor does it suggest that AFSCME had anything to do with his retention by the employees.

July 2, 1992, articles. The first two articles stated, among other things, that Volk had written a letter to school officials stating that, if Netherwood's contract were renewed, at least fifteen of thirty-seven current and former employees whom he represented were prepared to bring suit on allegations including sexual harassment, endangering employee safety, and invasion of privacy. The subsequent articles repeated this, but the final article did not state that the newspaper relied on the Volk letter for the information concerning the charges the employees were threatening to bring if Netherwood were reappointed.[7]

II. *Discussion.*

A. *Summary judgment for the newspaper.* Netherwood contends that the motion judge erred in granting summary judgment for the newspaper because, contrary to the judge's determination, Netherwood was not a public official for purposes of this action. Accordingly, he argues, he need not (but nonetheless claims he did) show that genuine issues of material fact exist that would permit him to prove by clear and convincing evidence that the defamatory statements were published with "actual malice," i.e., at a time when the defendant newspaper knew of their falsity or in fact entertained subjective doubt as to their truth. See *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 280 (1964); *St. Amant* v. *Thompson*, 390 U.S. 727, 730-731 (1968). Netherwood maintains that he was instead at all relevant times a private figure, and thus needed to show only that the newspaper published a false and defamatory statement with a negligent disregard for its truth or falsity.[8] See *Stone* v. *Essex County Newspapers, Inc.*, 367 Mass. 849, 851, 858 (1975); *New England Tractor-Trailer Training of Conn., Inc.* v. *Globe Newspaper Co.*, 395 Mass. 471, 477 n.4 (1985). Where, as here, the facts pertinent to the plaintiff's status are uncontested, the

---

[7]Also mentioned in the articles were matters such as an ongoing labor dispute, Netherwood's uncertain job status, and statements from various individuals, including Netherwood.

[8]A private figure plaintiff in a defamation action against a media defendant bears the burden of proving, inter alia, that defamatory statements concerning matters of "public concern" are false. See *Shaari* v. *Harvard Student Agencies, Inc.*, 427 Mass. 129, 131-132 (1998). Plaintiffs who are public officials or figures must always prove the existence of a defamatory falsehood as against a media defendant. See *Philadelphia Newspapers, Inc.* v. *Hepps*, 475 U.S. 767, 776-777 (1986).

question whether the plaintiff is a public official is a question of law for the court. See *Stone* v. *Essex County Newspapers, Inc.*, 367 Mass. at 862-863.

The determination whether a particular plaintiff is a public official does not rest upon the application of a bright line test. In *Rosenblatt* v. *Baer*, 383 U.S. 75, 85 (1966), the Supreme Court stated that the "public official" category extended "at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." The governmental position must be one where the public would have an independent interest in the qualifications and performance of one who holds it, beyond the interest they would have in the performance and qualifications of all government employees. See *id.* at 86.

The judge who decides whether a particular plaintiff is a public official must determine whether the person's position is one that invites public scrutiny and discussion apart from that brought on by the controversy at issue. See *Stone* v. *Essex County Newspapers, Inc.*, 367 Mass. at 864, quoting from *Rosenblatt, supra* at 86-87 n.13. Other relevant considerations include the employee's remuneration and duties, his or her participation in decisions on public issues, the impact of the government position on everyday life, the potential for social harm from abuse of the government position, and the employee's access to the press. See *Rotkiewicz* v. *Sadowsky*, 431 Mass. 748, 753 (2000); *Stone, supra* at 865-866. The inquiry, moreover, is to be informed further by "the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." See *New York Times Co.* v. *Sullivan*, 376 U.S. at 270.[9]

As we have stated, the pertinent facts as to Netherwood are

---

[9]There are no Massachusetts cases directly on point. Other jurisdictions have, however, concluded that public school officials and municipal employees are public officials. See, e.g., *Murray* v. *Williams*, 166 Ga. App. 865, 867 (1983) (member of the board of directors of Metropolitan Rapid Transit Authority a public official); *Dattner* v. *Pokoik*, 81 A.D.2d 572, 573 (N.Y. 1981) (village building inspector with the authority and responsibility for recommending approval of building permit applications a public official).

undisputed. He was a municipal employee who, as the appointed director of maintenance and transportation for a sizable regional school district, was ultimately responsible for the maintenance of buildings and grounds for the nine schools in the several towns comprising the district and of twenty-one district vehicles and related equipment. He supervised a staff of approximately sixty people and oversaw an annual budget approximating one million dollars. His salary was $52,815 when first hired in 1989 and $58,785 during his final year of employment. Netherwood participated in, but did not have ultimate authority over, hiring and firing decisions for his department's employees. He determined work assignments for those employees, suggested and implemented a third shift for custodial staff, and made successful recommendations as to the retention and termination of outside contractors for asbestos and snow removal.

Netherwood was clearly in a managerial role with substantial responsibilities for which he received significant remuneration. His decisions had direct impact not only upon his department's employees but also upon the safety and well-being of children and faculty in the school district. The record indicates that, both prior to and apart from the events of which Netherwood complains in this action, there was public scrutiny of Netherwood's position and job performance, relating to such matters as alleged misuse of maintenance and transportation funding, budgetary concerns, and concerns about air quality in a district school that was forced to close for several days as the result of improper removal of mold-laden carpet by Netherwood's staff.[10]

Given the scope of Netherwood's duties, the level of his

School principals also have been held to be public officials. See, e.g., *Johnson v. Robbinsdale Indep. Sch. Dist. No. 281*, 827 F. Supp. 1439, 1443 (D. Minn. 1993); *Kapiloff v. Dunn*, 27 Md. App. 514, 524 (1975), cert. denied, 426 U.S. 907 (1976); *Palmer v. Bennington Sch. Dist., Inc.*, 159 Vt. 31, 37 (1992).

[10]On March 6, 1990, Sayer wrote to the Amherst selectmen and finance committee, among others, in response to a memorandum they had received alleging misuse of school funding by Netherwood. On January 17, 1991, Netherwood and the assistant superintendent responded to a budget liaison committee's questions concerning the use of Netherwood's budget. In the spring of 1991, a document entitled "Amherst Taxpayer's Concerns" was posted at town meeting and at the junior high school raising the same concerns. In April, 1992, there was controversy over improper removal of carpet that had covered mold caused by a leaking roof, which resulted in noxious odors and the school's closing for four days.

compensation, the continuing public debate about the performance of his duties, and the impact of his job performance not only upon the sixty employees whom Netherwood supervised but also on the regional public school district's students, faculty, and other employees, we see no error in the judge's determination that Netherwood was a public official for the purposes of his defamation action. As such, in order to recover for the newspaper's publication of defamatory falsehood relating to his official conduct, Netherwood was required to demonstrate by clear and convincing evidence that the subject statements were made with actual malice. See *Rotkiewicz, supra* at 752, 755. "In the context of defamation, the term 'actual malice' does not mean the defendant's dislike of, hatred of, or ill will toward, the plaintiff. Rather, actual malice means that the 'defamatory falsehood was published with knowledge that it was false or reckless disregard of whether it was false.' " *Id.* at 755, quoting from *Stone, supra* at 867.

The plaintiff does not contend that the newspaper knowingly published defamatory falsehoods about him. He argues instead that the articles were published with reckless disregard of the statements' truth or falsity. The inquiry is not whether the content of the article was substantially correct. See *New York Times* v. *Sullivan*, 376 U.S. at 286. Nor is reckless disregard to be measured "by whether a reasonably prudent [person] would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." See *Twohig* v. *Boston Herald-Traveler Corp.*, 362 Mass. 807, 810 (1973), quoting from *St. Amant* v. *Thompson*, 390 U.S. at 731. See also *King* v. *Globe Newspaper Co.*, 400 Mass. 705, 719-720 (1987), cert. denied, 485 U.S. 940 & 962 (1988); *McAvoy* v. *Shufrin*, 401 Mass. 593, 599 (1988).

Before publication of the June 19, 1992, article, the newspaper reporter Blixt had been assigned to report on labor problems in the regional school district and on the renewal of Netherwood's contract. Blixt read Volk's letters of April 27 and May 14, 1992, to school officials, and spoke with Netherwood, Sayer and several school employees. The article references and quotes from the Volk correspondence and also quotes Netherwood.

The reporter Plaisance wrote the articles appearing on June 26 and 27, and July 2. The June 26 article focuses upon a Sayer memorandum distributed to school employees stating that Netherwood's contract was not being renewed. The article references the memo and quotes head custodians from three district schools and the vice chair of the school committee, as well as Netherwood. It indicates that Sayer and his assistant superintendent, Bell, declined comment, and repeats the substance of the June 19 article by referencing the Volk correspondence, and it also discusses the failed union decertification vote and ongoing infighting in Netherwood's department. The June 27 article addresses the grievance that Netherwood filed against his employer to clarify his job status. The article quotes Netherwood's lawyer, as well as Volk; indicates that neither Netherwood nor Sayer could be reached for comment; and both references and repeats the substance of the Volk correspondence and reiterates items mentioned in the prior articles. The July 2 article addresses Netherwood's unsuccessful grievance hearing, his continued desire to keep his job, and the next steps he planned to take in that regard. The article repeats the substance of the Volk correspondence as previously reported but does not attribute to or specifically reference such correspondence in connection with the reported employee complaints of sexual harassment, invasion of privacy, and endangerment of safety. Plaisance's sources of information were the Blixt article of June 19, and conversations with Netherwood, his attorney, and others as noted in the articles.

Netherwood contends that the newspaper's reckless disregard for the truth or falsity of the statements published is to be found in what must have been obvious to the reporters: that the complained of conduct by Netherwood against thirty-seven people (sexual harassment, invasion of employee privacy, endangerment of employee safety), as in *King*, 400 Mass. at 721, "if it had occurred, would have been highly unusual," and that, as in *Lyons* v. *New Mass Media, Inc.*, 390 Mass. 51, 57 (1983), the reporters' key sources were biased. There is, however, no indication in the record that was before the motion judge that Blixt entertained, or even had reason to entertain, serious doubt as to the accurately reported allegations in the

Volk correspondence, that he knew the sources upon which he relied were biased, or that Plaisance had serious doubt as to the truth and accuracy of Blixt's investigation and reporting. The reported allegations do not suggest that all thirty-seven employees were alleging identical conduct and, in any event, were balanced by quotes from Netherwood, his attorney, and at least one of his supporters. As to the final article, we fail to see how the lack of attribution to the Volk correspondence indicates serious doubt as to the allegations concerning Netherwood. Netherwood thus failed to show an ability to prove at trial by clear and convincing evidence that the newspaper had published the subject articles with actual malice. Summary judgment was properly granted.

B. *Judgment n.o.v. for the union.* The trial judge entered judgment n.o.v. for AFSCME on the plaintiff's claim that it had interfered with his contractual and advantageous relations with the school district and that it had defamed him by its December, 1991, communication to Sayer. "The standard to be applied in determining the adequacy of the evidence . . . is the same as that applied to a motion for a directed verdict." *Birbiglia* v. *Saint Vincent Hosp., Inc.*, 427 Mass. 80, 83 (1998). The evidence is to be examined in the light most favorable to the party who obtained a favorable verdict, here Netherwood, to see whether "anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff." See *Commonwealth* v. *Johnson Insulation*, 425 Mass. 650, 660 (1997), quoting from *Forlano* v. *Hughes*, 393 Mass. 502, 504 (1984).

However, a party cannot avoid entry of judgment n.o.v. if any essential element of his case rests on a "mere scintilla" of evidence. See *Stapleton* v. *Macchi*, 401 Mass. 725, 728 (1988). Judgments n.o.v. should be granted "cautiously and sparingly," See Wright & Miller, Federal Practice and Procedure § 2524, at 542 (1995), and should only be granted if the trial judge is satisfied that the jury "failed to exercise an honest and reasonable judgment in accordance with the controlling principles of law." See *Turnpike Motors, Inc.* v. *Newbury Group, Inc.*, 413 Mass. 119, 127 (1992), quoting from *Robertson* v. *Gaston Snow*

53 Mass. App. Ct. 11 (2001)                    21

Netherwood v. American Federation of State, County & Municipal Employees, Local 1725.

& *Ely Bartlett*, 404 Mass. 515, 520, cert. denied, 493 U.S. 894 (1989).

1. *Intentional interference with contractual relations.*[11] A defendant may be subject to liability if it intentionally and improperly interferes with an existing or prospective contract between a plaintiff and a third person by inducing or otherwise causing the third person not to perform the contract. Restatement (Second) of Torts §§ 766-767 (1979). In an action for intentional interference with either contractual relations or an advantageous business relation, a plaintiff must prove that (1) he had a contract (or business relationship for economic benefit) with a third party; (2) the defendant knowingly and intentionally interfered with that contract or relationship; (3) the defendant's interference was improper in motive or in means; and (4) the plaintiff was actually harmed by the defendant's actions. See *Harrison* v. *NetCentric Corp.*, 433 Mass. 465, 476 (2001); *Kurker* v. *Hill*, 44 Mass. App. Ct. 184, 191 (1998).

There was ample evidence at trial allowing a reasonable jury to find the plaintiff had a contract (or economic opportunity) with the school district. Our review of the transcript and trial exhibits persuades us that there was minimally adequate evidence of the second and third elements as well. The plaintiff's case, however, foundered on the fourth element of the tort, for he did not prove that the union's acts in December, 1991, were the proximate cause of the school district's nonrenewal of his

___

[11]In ruling favorably on AFSCME's motion for judgment n.o.v. as to both the interference and defamation counts, the judge took note of the jury's verdict in favor of Tuttle, and agreed with AFSCME's contention that, because the jury did not find the union's agent liable for acting in his representative capacity, the verdicts were inconsistent. He stated, "Like the count alleging defamation, there is inconsistency between the verdicts against Local 1725 and in favor of its business agent. The jury must have based their decision on the actions of individual members which, according to the evidence, were acting in their individual rather than representative capacities." Where, as here, a jury returns a special verdict, an objection that verdicts on several counts are inconsistent with each other must be taken at the time when the verdicts are returned and before they are recorded, so that the trial judge has an opportunity to correct the error if there is one. See *Adams* v. *United States Steel Corp.*, 24 Mass. App. Ct. 102, 104 (1987). This is true whether the inconsistency is patent on the verdict slip or latent. See *ibid.* Accordingly, the defendant's argument to the trial judge that the verdict was inconsistent was waived since it was not raised before the jury was discharged.

contract more than four months later. The trial judge observed in his decision as to the judgment n.o.v. that "[t]he failure to renew his [Netherwood's] contract was not caused by the December, 1991, letter from Tuttle to the superintendent," an observation fully supported by the record. To be sure, the Tuttle communications to Sayer in December, 1991, prompted Sayer to investigate the complaints that had been made against Netherwood. There were, however, significant intervening events in the months that followed: Sayer interviewed many employees; he informed Netherwood that he thought their complaints credible; he asked Netherwood to create a plan to address the issues raised; he deemed the Netherwood plan inadequate and told him so; he assessed Netherwood's continuing ability to do the job in such circumstances and ultimately concluded in April, 1992, that Netherwood's contract should not be renewed. The evidence, when viewed in Netherwood's favor, is inadequate to permit a reasonable conclusion that the nonrenewal of the plaintiff's contract directly and proximately resulted from the Tuttle communications to Sayer. The plaintiff's proof having failed on this element of the tort, see, e.g., *Harrison, supra* at 477; compare *Adcom Prod., Inc.* v. *Konica Bus. Machs. USA, Inc.*, 41 Mass. App. Ct. 101, 106 (1996), we discern no error in the entry of judgment n.o.v. on the count of intentional interference with contractual or advantageous business relations.

2. *Defamation.* There was evidence sufficient to permit the jury to find that Tuttle was authorized by AFSCME to send the letter to and meet with Sayer. See Restatement (Second) of Agency § 254 (1958). However, when, as here, the "union acts for some arguably job-related reason and not out of pure social or political concerns, a 'labor dispute' exists." See *Tosti* v. *Ayik*, 386 Mass. 721, 723 (1982), quoting from *Hasbrouck* v. *Sheet Metal Workers Local 232*, 586 F.2d 691, 694 n.3 (9th Cir. 1978). The term "labor dispute" is to be "broadly and liberally construed," and "defamatory statements made in the context of a labor dispute are actionable only if made with knowledge of their falsity or with reckless disregard of the truth. . . . In other words, State courts may grant relief in such defamation actions only if the defamatory statements were made with actual malice, as defined in *New York Times Co.* v. *Sullivan*, 376 U.S.

254, 279-280 (1964)." See *Tosti* v. *Ayik, supra* (internal citations and quotations omitted).

In his decision granting AFSCME's motion for judgment n.o.v. on the defamation count, the trial judge stated, "Considering the evidence as a whole and the letter in question, it is clear that the intention of the defendant local was to give notice to and provide the superintendent an opportunity to conduct a non-public investigation into charges which school department employees were making against a school department supervisor concerning employment issues." Our review of the evidence at trial confirms that the plaintiff produced no evidence to establish that Tuttle doubted or had reason to doubt seriously the veracity of the claims presented at the meeting which formed the substance of his letter. The plaintiff thereby failed in his proof of the essential element of actual malice, and judgment n.o.v. on the defamation count was properly entered.

*Judgments affirmed.*