Botsford, J.
After a jury trial that lasted fourteen days, the jury determined that every plaintiff had proved his, her or its claims against the various defendants before them, a group that included the defendants Benistar Property Exchange Trust Co., Inc., Daniel Carpenter, Molly Carpenter, Martin Paley, and Merrill Lynch, Pierce, Fenner & Smith (Merrill Lynch). All parties have moved for judgment notwithstanding the verdict. This memorandum of decision deals with the motion of Merrill Lynch. For the reasons stated below, the motion is allowed.[5]
Discussion
“In reviewing the denial of the motions for directed verdict and for judgment notwithstanding the verdict, the same standard applies. The standard is ‘whether ’’anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff." . . .’ “ Forlano v. Hughes, 393 Mass. 502, 504 (1984) (citations omitted). Accord, Netherwood v. American Fed. of State, County & Mun. Employees, Local 1725, 53 Mass.App.Ct. 11, 21 (2001), further app. rev. denied, 435 Mass. 1109 (2002). To be reasonable, an inference must be ’’based on probabilities rather than possibilities . . . And the evidence must be sufficiently concrete to remove any inference which the jury might draw from it from the realm of mere speculation and conjecture." Alholm v. Wareham, 371 Mass. 621, 627 (1976) (citations omitted).
The plaintiffs’ claims against Merrill Lynch were for aiding and abetting breach of fiduciary duty,[6] aiding and abetting conversion,[7] and violation of the consumer protection statutes of Connecticut and New York. In answers to special questions, the jury concluded that the plaintiffs had proved all of these claims. All parties agree that with respect to the aiding and abetting claims, New York law applies, that it applies as well to the claim of violation of the New York *221 consumer protection law, and that Connecticut law governs the claim of violation of the Connecticut consumer protection law.
I. Aiding and Abetting Claims[8]
To prove a claim of aiding and abetting breach of fiduciary duty or conversion under New York common law, the plaintiffs were required to present evidence showing that: (1) one or more of the other defendants owed the plaintiffs a fiduciary duty and was or were violating that duiy, or converting the plaintiffs’ funds, or both; (2) Merrill Lynch had actual knowledge of that breach of fiduciary duty, conversion, or both by these primary wrongdoers;[9] and (3) Merrill Lynch knowingly participated in that violation or breach of duty or conversion, or provided substantial assistance to the other defendant(s) in achieving the violation of duty or conversion. See, e.g., Kolbeckv. LIT America, Inc., 939 F.Sup. 240, 245 (1996), affd., 152 F.3d 918 (2d Cir. 1998); Briarpatch Ltd L.P. v. Geisler Roberdeau, Inc., 2002 U.S. Dist. LEXIS 20789 (S.D.N.Y. Oct. 31, 2002). See also S&K Sales Co. v. Nike, Inc., 816 F.2d 843, 847-48 (2d Cir. 1986). See generally Restatement (Second) of Torts, §876(b).
A. Breach of Fiduciary Duty and Conversion by Primary Wrongdoers
The trial evidence was undisputed that each of the plaintiffs, in seeking to accomplish real estate transactions that qualified as “like kind exchanges” for deferred capital gains tax treatment under §1031 of the Internal Revenue Code, entered into a series of related contracts or agreements with Benistar Property. Under these agreements, Benistar Property among other things was to (a) hold each plaintiffs funds that represented real estate sale proceeds until the plaintiff found a “replacement property” to purchase and directed Benistar Property to transmit the funds to the seller of that replacement property; (b) hold the funds in an “escrow custodial account” at Merrill Lynch (or later Paine Webber) for the plaintiffs benefit, in either a 6% “investment account” or a 3% money market account; and (c) transfer any of such funds only pursuant to the plaintiffs direction. In connection with these agreements, there was sufficient evidence for the juiy to find, as they did, that Benistar Property owed a fiduciary duly to each of the plaintiffs to protect the funds the plaintiff transferred to it; and that by engaging in highly risky, uncovered option trading with the commingled funds out of accounts opened at Merrill Lynch (and later PaineW-ebber), Benistar Property as well as the three individual defendants acting on behalf of Benistar Property (i.e., Daniel Carpenter, Molly Carpenter and Martin Paley), breached that fiduciary duiy. There was also sufficient evidence to warrant the jury’s determination that Benistar Properly, Carpenter and Paley converted the funds of the plaintiffs. Thus, in connection with the aiding and abetting claims against Merrill Lynch, the plaintiffs established the necessary first element
that one or more of the other defendants — Benistar Property, Daniel Carpenter, Molly Carpenter, Martin Paley — had committed the underlying breach of duty and conversion. I turn, therefore, to the second element, namely, actual knowledge on the part of Merrill Lynch of the other defendants’ breach of duty, conversion, or both.
B. Merrill Lynch’s Actual Knowledge
Daniel Carpenter, acting on behalf of Benistar Property and other corporate Benistar entities, opened seven separate accounts with Merrill Lynch in 1998, four of which were in the name of Benistar Property. One of these Benistar Properly accounts, referred to as Account 849 07B10, was used extensively for uncovered or option trading from 1998 until September 20, 2000. There was a great deal of evidence that the two Merrill Lynch brokers who were in charge of the Benistar accounts, Gary Stern and Gerald Levine, communicated frequently if not almost constantly— Gerald Levine on generally a daily basis for an hour or more on the telephone — with Carpenter in relation to the Benistar Property option trading account(s), and conducted an enormous number of uncovered option transactions out of this account during this entire period. There was, however, no direct evidence that Stem or Levine, their immediate supervisor Thomas Rasmussen, the branch manager Hassan Tabbah, or anyone else at Merrill Lynch knew or was made aware by Carpenter or any person that in fact the funds in Benistar Property’s option trading accounts) belonged to clients of Benistar Property. Nor, certainly, was there direct evidence that anyone at Merrill Lynch knew that in fact Benistar Property had entered escrow agreements with its clients to hold those funds in custodial accounts at Merrill Lynch and deliver them only in accordance with the plaintiffs’ direction, and that the use of these client funds for risky option trading was violating a fiduciary duiy owed by the defendants to the plaintiffs. (For example, there is no dispute that no one at Merrill Lynch ever saw any of the written agreements between Benistar Property and the various plaintiffs, and no dispute that Merrill Lynch was never and were ever informed by the plaintiffs or by Carpenter of the plaintiffs’ interest in the Benistar Property accounts.)[10] All the Benistar accounts that Carpenter opened at Merrill Lynch were corporate accounts, not custodial, tmst, depository or escrow accounts; each account opening agreement signed by Carpenter contained a representation that the money in the account belonged to the account holder only (e.g., Ex. 301); and the Merrill Lynch witnesses, Stern, Levine, Rasmussen, and Duffy, testified that Carpenter had told them the money in all the Benistar accounts, including Benistar Property ,was his.[11]
The plaintiffs rightly point out that the jury were not required to believe the testimony of the Merrill Lynch witnesses about what Carpenter told them *222 concerning the source of funds in the Benistar Property and other Benistar accounts, or generally about their lack of knowledge that the funds in the Benistar Property accounts belonged to Benistar Property’s clients. It is also obviously true that the plaintiffs were not required to prove their claim of “actual knowledge” on Merrill Lynch’s part by direct evidence. The question is whether there was circumstantial evidence presented from which the jury could draw reasonable inferences that Merrill Lynch did have actual knowledge of the other defendants’ breach of fiduciary duty, conversion, or both.
The evidence that comes to the fore in this inquiry, and on which the plaintiffs rely heavily, is the letter Carpenter wrote to Thomas Rasmussen of Merrill Lynch dated September 22, 2000. The letter states in part:
Re: BENISTAR Property Exchange 849-07B10
Dear Tom:
You have been very helpful to us in the past, and I wanted to lodge an official complaint with you against Merrill Lynch.
I am very upset and disappointed with Merrill’s Option Compliance Department’s decision to prohibit BENISTAR Property Exchange Trust Company from opening any new positions in our account (849-07B10, etc.). The decision is short sighted at best and will likely cause us to miss trading profits of $2,000,000 or more in the coming months. We intend to hold Merrill legally responsible for those lost profits as the Compliance Department’s action came without warning and had either I or my broker Jerry Levine been warned of this pending action, we would have handled the close out and rollover of the BENISTAR positions at options expiration differently . . .
Suffice it to say, the frequent selling and buying in of puts at the 420 level of SDLI will provide a real cash cow for us that would allow us to recover most if not all of our past losses, much of which we feel is directly attributable to Merrill’s actions . . . We have chosen Merrill as our depository for our clients so we cannot move the funds elsewhere. If we cannot trade at Merrill, we cannot trade anywhere, and you will have doomed us to our losses in a volatile market that we were perfectly positioned to profit from.
Let me conclude by saying that Merrill Lynch has no bigger fan than Dan Carpenter and that BENISTAR has met each and every one of its maintenance or margin calls on a timely basis, no matter how painful. This has been a tricky market for a lot of people, but just as we were poised to win back some of our losses, Merrill has pulled the rug out from under us. This is not right, nor is it justified. In fact, you know better than anyone that each and every one of our technical trading violations has been Merrill’s error and not ours. I want to make clear that we have the utmost respect for not only you, but our entire team at Merrill including Nancy Sawyer, Gary Stem, Hassan Tabbah, and our lead broker, Jerry Levine. We do not hold you or them at fault, but Merrill’s compliance unit’s decision will cost us $3 to $4 million in trading profits between now and January . . .
We would like to formally appeal Merrill’s decision, and if we are not allowed to trade we would like to explore with you the various options of restitution available to us. Thank you for your thoughtful consideration and help in the past as well as with these difficult circumstances.
s/Daniel B. Carpenter
(Ex. 93; emphasis supplied.) All of the Merrill Lynch witnesses who testified to having read this letter when it was received, Levine, Rasmussen, and Kevin Duffy, indicated that they did not understand the reference to “depository for our clients” as referring to the fact that the Benistar Properly option account contained client, or third-party funds; rather, they said, they interpreted the reference to be to the Benistar companies in whose names the B10 and other Benistar accounts had been opened.[12] In addition, a number of Merrill Lynch witnesses, including the letter’s recipient, Thomas Rasmussen and the Merrill Lynch attorney to whom he referred the letter, testified that they did not consider the letter to be a formal complaint against Merrill Lynch. Merrill Lynch argues that this testimony, even if disbelieved, presents nothing to meet the plaintiffs’ burden of showing knowledge, because disbelief of testimony cannot be converted into affirmative evidence of the opposite. See, e.g., Litos v. Sullivan, 322 Mass. 193, 196 (1947); Kunkel v. Alger, 10 Mass.App.Ct. 76, 86 (1980).
While this is an accurate statement of the eviden-tiary principle, it does not entirely apply to the September 22 letter, because the letter itself (the highlighted portion) offers affirmative evidence that Merrill Lynch was directly and explicitly informed— and therefore reasonably could be found to have known — that the Benistar Property account(s) contained client funds. The trouble is that knowledge that the accounts held client funds is not the same as knowledge that in using the funds in the Benistar Property accounts for option trading, Benistar Property and Carpenter were breaching fiduciary duties owed to those clients, converting their funds, or both.
The plaintiffs assert that all the testimony at issue (including Stem’s denial of having read the letter) was incredible and evidence of intentional prevaricating by Merrill Lynch’s witnesses, and that the jury could use this as consciousness of liability on the part of Merrill Lynch, and give it probative force. They rely principally on Boston v. Santosuosso, 307 Mass. 302, 349 (1940).
*223 I disagree. While Massachusetts cases have “recognized that a defendant’s wilfully untrue testimony as to a material fact ‘tends to show consciousness of guilt or liability on his part and has probative force in connection with other evidence on the issue of such guilt or liability,’ Boston v. Santosuosso, [supra] . . .” Commonwealth v. Edgerly, 390 Mass. 103, 109-10 (1983) (emphasis supplied),[13] this principle does not completely fill the evidentiary void in this case. If one assumes for argument that the employees of Merrill Lynch are properly treated as the equivalent of “the defendant” for purposes of applying this Santosuosso principle and further that the jury could conclude their testimony about their understanding of the September 22 Carpenter letter was “wilfully untrue,” two evidentiary points result: (1) the September 22 letter offers some independent evidence that as of September 22,2000, Merrill Lynch had been informed directly that the Benistar Properly accounts contained third-party or client funds and therefore had that knowledge; and (2) the Merrill Lynch employees’ testimony that they read the letter’s reference to “clients” to mean the various Benistar entities might permissibly be accepted as providing additional probative support for the finding that Merrill Lynch actually knew the accounts held third-parly funds. But it seems a perversion of the principle set forth in the Santosuosso case to use the employees’ testimony as probative evidence about Merrill Lynch’s knowledge not just that the Benistar Property accounts) held client funds, but also that in engaging in uncovered option trading with those funds, Benistar Property and Carpenter were breaching a fiduciary duly owed to the clients with respect to the safekeeping of those funds, and perhaps were engaged in converting those clients’ funds as well. This is so because there is nothing in the September 22 letter itself and no other independent evidence that provides a reasonable basis for an inference that such additional knowledge of fiduciary breach or conversion on the part of Stem, Levine or any of the Merrill Lynch employees did exist — as of September 22, before that date, or indeed at any time before January 2001, when the plaintiffs first made their existence and claims known to Paine Webber.[14]
The plaintiffs say there is other, independent evidence from which the jury reasonably could infer Merrill Lynch’s actual knowledge of the fiduciary duty breach and conversion. They point to the following: (1) the testimony of Paine Webber employees Lori Enright and Steven Feit concerning a telephone conversation they had with Merrill Lynch’s Gary Stern in December of 2000, and Enright’s handwritten notes of that conversation; (2) the many wire transfers of funds into and out of the Benistar Properly account(s), especially when considered in conjunction with the provisions of the Merrill Lynch policy manual; (3) Benistar Property’s name, which includes both the terms “Trust Company” and “Property Exchange,” viewed in light of the obligation of Merrill Lynch to comply with the New York Stock Exchange’s “know your customer” mle, an obligation the Merrill Lynch brokers said that they fully met; and (4) the contents of the Benistar website, that some of the Merrill Lynch employees visited. I consider them in turn.
(1) Lori Enright testified (in deposition) that when she and other Paine Webber employees spoke to Gary Stem on December 19,2000, at the time Paine Webber was making the decision to close out the Benistar option trading accounts because of excessive losses and risk, Stern told the PaineWebber personnel that “Benistar” acts as a third-party liaison for real estate transactions. (Enright deposition, p. 148.)[15] There was no evidence explaining what Stern meant by “third-party liaison for real estate transactions,” and despite the plaintiffs’ suggestion to the contraiy, the meaning of the phrase is not self-evident. Moreover, Enright’s deposition testimony and notes indicate that Stem was speaking of Carpenter and “Benistar” together; there was no specific focus on Benistar Property at all. In the circumstances, I consider the suggestion that Stem’s words reflected knowledge on his part that Benistar Property was in the business of holding in escrow other people’s funds connected with real estate purchase and sale transactions — and also (as the plaintiffs are required to show) knowledge that Benistar Property was improperly using those funds for risky stock trades — to be entirely speculative. The PaineWebber evidence of the December 2000 telephone conversation does not constitute evidence that Merrill Lynch, through Stem, knew Benistar Property or one or more of the individual defendants was or were carrying on a scheme in connection with Benistar Property’s Merrill Lynch accounts that involved a breach of fiduciary duty owed to Benistar Property’s clients and conversion of their funds.
(2) There were a great many wire transfers of funds into and out of the Benistar Property option trading account(s). Although there was testimony from some witnesses, including Merrill Lynch’s expert, Robert Lau, that substantial wire activity is not unusual in a corporate account, the jury were entitled to conclude that the volume of wire transfers was notably high. Moreover, the jury could consider the fact that many of the wire transfers were to and from lawyers’ client accounts, escrow accounts, depository accounts, etc. The plaintiffs assert the jury could infer that Merrill Lynch understood the references to “client” on the Benistar Property wire transfer authorization forms signified the clients of Benistar Property’s property exchange business. However, there was no evidence that Merrill Lynch knew Benistar Property’s business was one of serving as the intermediary for property exchanges (whether related to §1031 of the Internal Revenue Code or otherwise). The Merrill Lynch employees, including specifically Levine, Stern and Rasmussen, testified they thought Benistar or Benistar Property was engaged in the business of buying and *224 selling real estate.[16] Again, disbelief of such testimony does not translate into affirmative evidence that one, some or all of these individuals understood that (a) Benistar Property did not itself buy and sell real estate but simply held funds belonging to others who engaged in real estate transactions, and (b) Benistar Property and its principals were wrongfully using those funds for option trading.[17]
(3) Benistar Property’s full name, Benistar Property Exchange Trust Company, is said by the plaintiffs to provide inferential evidence that Merrill Lynch “knew and understood that Benistar Property was a “Trust Company’ in the business of performing ‘Property Exchange’ transactions.” (Consolidated Plaintiffs’ Opposition, p. 9.) This is so, it is argued, particularly when one considers the name in the context of NYSE Rule 405, the “know your customer” rule: since Stem and Levine testified that they had fully complied with the rule, both as written and as incorporated into a requirement of the Merrill Lynch policy manual, the jury could reasonably infer that the two brokers learned from necessary inquiry into the business and name of Benistar Property that it was engaged in holding its clients’ funds connected to their real estate exchange transactions.
This argument has some surface appeal as a matter of abstract logic, but in the end, it fails. Compliance, or full compliance with Rule 405 and the policy manual means different things to different people. While Stem and Levine testified they had complied with the rule, they also indicated in substance testified that they had not asked questions about what the words “property exchange” or “trust” means in Benistar Property’s name, or questions about whether the source of funds for Benistar Property was its own or other people’s, and simply accepted Daniel Carpenter’s representations that the funds were his. The jury might reasonably find that in fact Stern and Levine did not fully comply with Rule 405, but the jury could not permissibly conclude from this evidence that either or both brokers actually did inquire into and learn to what the “property exchange” in Benistar Property’s name referred and what the reference to “Trust” signified in relation to other people’s money.
(4) The Benistar.com website: Daniel Carpenter told various Merrill Lynch employees to look at the Benistar.com website; Hassan Tabbah testified that he looked at it, but did not describe what he looked at; Gary Stem testified he glanced at the home page of the website while Hassan Tabbah was in his office; Gerald Levine testified he looked at the website but only at the information about “§419 plans” — employee benefit plans set up under §419 of the Internal Revenue Code — that Benistar Ltd. administered. It is the case that the Benistar.com website contains information about Benistar Property Exchange Trust Company and its role as a “qualified intermediary” for purposes of property exchanges under §1031 of the Internal Revenue Code, but this appears in a separate, discrete part of the website that is not visible on the home page or in connection with any information about §419 plan administration. The only reference appearing on the home page is a box included in a list of “products” that states, “1031 exchange.” There was no evidence introduced that at any time before this litigation commenced, Gary Stem or Gerald Levine knew what a “1031 exchange” was, or that Carpenter had ever explained or referred to the term in his dealings with either of them, or any other Merrill Lynch employee, or, more particularly, had ever explained that Benistar Property was in the business of serving as a qualified intermediaiy for § 1031 properly exchanges. The plaintiffs contend again, citing the Santosuosso case,[18] that the lack of credibility the jury could reasonably attach to Stern’s and Levine’s testimony about their knowledge of the Benistar.com website authorized the juiy to conclude that indeed one or both of them had visited the portion of the site dealing with Benistar Property and §1031 exchanges. The argument falls. Whether or not Stem or Levine visited this portion of the website simply is not a material fact. There is no basis to set aside the general rule that disbelief does not create evidence of the opposite.
To summarize: there was evidence, in the form of the September 22, 2000 letter from Daniel Carpenter to Thomas Rasmussen of Merrill Lynch, from which the juiy reasonably could infer that Merrill Lynch knew at least as of that date that the Benistar Property account held client funds. The letter, however, pro- . vides no information as to the nature of the relationship between Benistar Property and such clients, and none as to Benistar Property’s rights and duties vis a vis such clients or, more particularly, their funds. It could be argued that Merrill Lynch, informed in the letter that it was serving as Benistar Property’s “de-positoiy for our clients,” was put on clear notice that clients’ funds were at risk, and should have taken steps to investigate. But where, as here, no fiduciary duty was owed directly by Merrill Lynch to the plaintiffs, the “actual knowledge” prong of aiding and abetting liability does not impose a duty to investigate. See Kolbeck v. LIT America, Inc., supra, 939 F.Sup. at 247 (“. . . a failure to investigate, i.e., constructive knowledge is not enough to support a claim for aiding and abetting a fiduciary duty absent the existence for a fiduciary duty running from defendant to plaintiff’). See also New York Uniform Commercial Code §8-115, comment 3 (“. . . this section applies even though the . . . broker . . . had notice or knowledge that another person asserts a claim to the securities”).
Other evidence in the case, discussed above, at best may have put Merrill Lynch on notice that client funds related to real estate transactions might be part of the Benistar Property accounts, but again, constructive knowledge and actual knowledge are not the same. More to the point, there is no evidence that Stem, Levine, Rasmussen or anyone at Merrill Lynch had *225 any knowledge at all that any client funds at issue were supposed to be held in custodial escrow accounts and not to be commingled and used for risky option trading. The trial evidence, in the end, was simply insufficient to meet the second half of the “actual knowledge” requirement involved in this case, namely that Merrill Lynch knew one or more of the other defendants was or were breaching fiduciary duties owed to clients, converting client funds, or both.
C. Substantial Assistance
Quite apart from the issue of actual knowledge, there was insufficient evidence to justify a determination that Merrill Lynch had knowingly participated in the breach of duty or conversion by the other defendants, or had rendered them substantial assistance in achieving their wrongful scheme.
A defendant provides substantial assistance by affirmatively aiding the primary wrongdoer or affirmatively helping the wrongdoer to conceal the improper scheme. Kolbeck, supra, 939 F.Sup. at 247. See Diduck v. Kaszycki & Sons Contractors, Inc., 974 F.2d 270, 284 (2d Cir. 1992); Cromer Fin. Ltd. v. Berger, 137 F.Sup.2d 452, 470 (S.D.N.Y. 2001). Merrill Lynch points out, and the plaintiffs do not seem to disagree, that where, as here, Benistar Property’s account was non-discretionary, Merrill Lynch’s actions in effecting trades under Carpenter’s direction do not amount to “substantial assistance.” See, e.g., Cromer, 137 F.Sup. at 470. The plaintiffs, however, argue that the evidence showed more affirmative conduct on Merrill Lynch’s part that permitted a finding of the requisite level of participation or assistance in the forms of active concealment as well as affirmative aid.
Thus, the plaintiffs see the memorandum prepared by Gary Stem and Gerald Levine in response to an inquiry by Jennifer Waddington of the Merrill Lynch compliance department as an act of concealment. In relation to a review of the Benistar Property option trading account, No. 849-07B10, the compliance department had directed the brokers to prepare a memorandum discussing losses, trades, and also to answer the question of “(w]hat is the net worth of this company?” (Ex. 86.) The Stern/Levine responding memorandum goes on at some length about the business activities of the “client” who is described as a “licensed attorney, insurance and real estate broker,” and the brother of a stock analyst. (Ex. 84.) The response states the “client” “reports his net worth in excess of $30 million.” Certainly this answer does not deal with the net worth of Benistar Property, the company, but there is no way that Jennifer Waddington or anyone else reading the Stern/Levine memorandum would have been misled into thinking that it did. There is no evidence that Jennifer Waddington took steps to require the brokers to answer the actual question she had asked about Benistar Property. It is not reasonable to infer, however, that she did not do so because she was misled by the Stern/Levine memorandum into thinking they had provided her with the answer. Furthermore, the plaintiffs contend that Stern and Levine answered the way they did because they were helping to conceal from the Merrill Lynch compliance department the unauthorized, improper trading of third-party funds that was taking place out of the Benistar Property account so that they could continue to earn commissions from the trades. For reasons discussed above, this assertion assumes a level of knowledge on Stem’s and Levine’s part that was not shown to exist.
The plaintiffs also focus on the conduct of Merrill Lynch following its receipt of Daniel Carpenter’s September 22, 2000 letter. By not treating the letter as a complaint subject to disclosure to the National Association of Securities Dealers — and thereafter, the plaintiffs suggest, to securities regulators or law enforcement agencies — Merrill Lynch avoided exposure of its own facilitative wrongdoing. As suggested above (see note 14), there is little if any evidence that reporting the September 22 letter as a “complaint” was likely to inform any securities or regulatory authorities about much of anything, much less the potential of wrongdoing by Benistar Property, Carpenter, and Merrill Lynch. It is true, however, that Hassan Tabbah testified that if he had known in September 2000 what he knew as a result of this litigation about Benistar Property’s use of client escrow funds, he would have been in touch with the Merrill Lynch compliance department, and his guess was that the account would have been frozen and the compliance department would then decide whether or not they were going to investigate it further and involve regulators and law enforcement authorities. (Tabbah Tr., pp. 161-62.)
Even if one assumes hypothetically that Merrill Lynch did know in September 2000 what Tabbah testified he knew in November 2002, the failure to report the letter as a complaint did not provide substantial assistance to the other defendants’ wrongful conduct. Closely intertwined with the concept of “substantial assistance” is the principle of proximate cause. See Diduck v. Kaszycki & Sons Contractors, Inc., supra, 974 F.2d at 284; Cromer Fin. Ltd v. Berger, supra, 137 F.Sup.2d at 470; Kolbeck v. LIT America, Inc., supra, 939 F.Sup. at 249. On the trial record, including Tabbah’s testimony, the road to be traveled from Merrill Lynch’s failure to report the September 22 letter, to an investigation by regulators or law enforcement agencies, to a revelation to the plaintiffs at that point — before even greater losses were incurred — of Benistar Property’s and the other defendants’ wrongdoing, is too long and uncertain to provide the causal link that is necessary for assistance to qualify as substantial. Cf. Lerner v. Fleet Bank, N.A., 318 F.3d 113, 123-24 (2d Cir. 2003).
The plaintiffs also focus on the conduct of Gary Stem following Merrill Lynch’s closing of the Benistar Property and other Benistar accounts in September *226 2000. The evidence indicated that after the decision to close the Merrill Lynch accounts, Stern called his good friend Mitchell Rock at Paine Webber to tell him about Daniel Carpenter and the Benistar accounts and suggest that these would be veiy good clients for Rock. There is also evidence that someone at Merrill Lynch faxed or sent some of the Merrill Lynch Benistar Property account statements to Rock at Paine Webber, and that this form of direct contact and provision of account information violated some Merrill Lynch policies.
This conduct, even if it was contrary to Merrill Lynch’s policies and even if it is deemed helpful to Carpenter, simply does not rise to the level of substantial assistance. There was much testimony about the automated system (ACAT) readily available to customers of stock brokers that enables them to transfer their stock accounts from one brokerage house to another, and the ease with which this is done. No evidence indicated or suggested by way of inference that without the contact made by Stem to Rock, Daniel Carpenter would have been unable to use ACAT in order to transfer the Benistar Property accounts from Merrill Lynch to another brokerage house, whether Paine Webber or somewhere else, and therefore would have been unable to continue engaging in option trading. To meet the standard of “substantial” under New York law, the aid must be far more comprehensive (and causally connected to the plaintiffs’ harm) than this. See Cromer Fin. Ltd v. Berger, supra, 137 F.Sup.2d at 471-72, and cases cited.
II. Claims Under the New York and Connecticut Consumer Protection Acts
A. New York Consumer Protection Act
The New York Consumer Protection Act, N.Y. Gen.. Bus. Law §349 (McKinney 1999), requires proof that (1) Merrill Lynch’s conduct harmed the plaintiffs and also had “a broad impact on consumers at large,” and (2) its acts or practices were deceptive or misleading in a material way. I continue to be of the opinion that the plaintiffs presented sufficient evidence to satisfy the first element. I agree with Merrill Lynch that there was not sufficient evidence that Merrill Lynch committed acts or practices that were materially deceptive or misleading to the plaintiffs. This conclusion is premised on my determination discussed previously that there was not sufficient evidence to support a finding that Merrill Lynch aided and abetted Benistar Properly and the other defendants in their wrongful conduct. In addition, it is also the case that there was never any contact between Merrill Lynch and any of the plaintiffs, which has a bearing on whether Merrill Lynch’s conduct can be seen as misleading or deceptive as to them.
B. Connecticut Unfair Trade Practices Act
The Connecticut Unfair Trade Practices Act (CUTPA), Conn. Gen. Stat. §42-10a etseq., prohibits persons from engaging “in unfair or deceptive acts or practices in the conduct of any trade or commerce.” The plaintiffs were required to present sufficient evidence for the jury reasonably to find that Merrill Lynch engaged in or committed one or more unfair or deceptive acts or practices in conducting its stock brokerage business, that these acts or practices caused injury to the plaintiffs, and damages.
Having determined the plaintiffs did not prove Merrill Lynch aided or abetted the other defendants in their breaches of fiduciary duly or conversion, I conclude that they have also not proved a violation of CUTPA, since there was no evidence relating to a separate type of act or practice that might qualify as unfair or deceptive conduct. Accordingly, I do not need to reach Merrill Lynch’s argument that as matter of law CUTPA does not apply to the securities transactions at the heart of the plaintiffs’ claims against it.
ORDER
For the foregoing reasons, the motion for judgment notwithstanding the verdict of the defendant Merrill Lynch, Pierce, Fenner & Smith, Inc. is allowed.

Merrill Lynch has filed a separate motion for a new trial and another motion to reject the jury’s “advisory opinion” on two claims. In light of my determination to allow this motion for judgment notwithstanding the verdict, it is not necessary to consider the other two motions.

In particular, the plaintiffs claimed that Merrill Lynch aided and abetted breaches of fiduciary duty by the other four defendants, that is, Benistar Property, Daniel Carpenter, Molly Carpenter, and Martin Paley. All the plaintiffs claimed that the first three of these other defendants breached fiduciary duties owed to the plaintiffs; three of the plaintiffs, Joseph Iantosca, Belridge Corporation and Bellemore Associates, LLC, also claimed that Molly Carpenter had breached fiduciary duties. The jury found all four of these defendants liable for breach of fiduciary duty.

The plaintiffs claimed, and the jury agreed, that Benistar Property, Daniel Carpenter, and Martin Paley all converted funds belonging to the plaintiffs; these were the conversions that the plaintiffs claimed Merrill Lynch aided and abetted.

Merrill Lynch argues strenuously that the verdicts on the plaintiffs’ aiding and abetting claims must be overturned because the evidence failed to satisfy the rigorous standard of the collusion exception set forth in §8-115(2) of the New York Uniform Commercial Code. For reasons I have stated at *227 various times in this litigation, I disagree with this analysis of §8-115(2). I do not consider further Merrill Lynch’s §8-115 argument.

the New York cases make clear that “actual knowledge” requires more than simply proof that the defendant had constructive knowledge — should have known. See Kolbeck v. LIT America, Inc., 939 F.Sup. 240, 246 (1996), aff'd., 152 F.3d 918 (2d Cir. 1998). Actual knowledge appears to encompass “willful blindness,” that is, acting with a conscious purpose to avoid learning the truth. See, e.g., Wight v. BankAmerica Corp., 199 U.S. Dist. LEXIS 5087 *24 (S.D.N.Y.), rev’d on other grounds, 219 F.3d 79 (2d Cir. 2000).

 Similarly, there was no evidence that anyone at Merrill Lynch was aware, during the time that the plaintiffs’ funds were at Merrill Lynch, of the other defendants’ conversion of funds.

Hassan Tabbah, the fifth Merrill Lynch witness (although first to testify), stated that when he spoke to Carpenter, Carpenter did not tell him that the funds belonged to other people.

Gary Stern testified that he had not read this letter, but was only made aware of its existence from a discussion with Gerald Levine.

The passage from the Santosuosso case that is quoted in part in Edgerly is the following:
The trial judge found “consciousness of guilt on the part of both defendants in that each testified falsely ... in material particulars.” This finding imports that such testimony was wilfully untrue. This is the natural meaning of the word “falsely” used in this connection . . . and the finding of consciousness of guilt imports a finding of facts essential to support it... Of course, as has been pointed out many times, disbelief of evidence is not the equivalent of affirmative evidence to the contrary. But where a mate-rialfact is established by evidence and it is shown that a defendant’s testimony as to that fact was willfully untrue, this circumstance not only furnishes a ground for disbelieving other testimony of this defendant..., but also tends to show consciousness of guilt or liability on his part and has probative force in connection with other evidence on the issue of such guilt or liability. Such false testimony is in the nature of an admission from which, with other evidence, guilt or liability may be inferred.
Boston v. Santosuosso, 307 Mass. 302, 349 (1940) (emphasis supplied; citations omitted).

The plaintiffs argue that the purportedly false testimony that the September 22 letter was not a complaint also constitutes probative evidence of liability. For such testimony to serve as the basis of consciousness of liability on Merrill Lynch’s part, it would have to be shown that if the letter were deemed a complaint and treated as such by Merrill Lynch, that characterization would have had some consequences adverse to Merrill Lynch. (This seems to be the import of the emphasis in Santosuosso and later cases that the fact on which false testimony is offered be “material.”) The plaintiffs did not make this showing. There was confusing evidence about the letter’s status as “a complaint.” Two witnesses, Kevin Duffy and Merrill Lynch’s expert, Robert Lau, testified that they did not consider it a complaint that would be reported as one to be recorded on a NASD Form U-4 or U-5, because it was not criticizing any sales practice involving a broker. The interpretation of the letter as not dealing with a broker’s sales practices appears to be clearly correct, and there was no evidence suggesting that something other than a criticism about a broker’s sales practice was to be reported in connection with the U-4 and U-5 forms. Robert Lau did acknowledge that for purposes of NASD Rule 3070 (Ex. 109), the term complaint was defined broadly as “any written grievance by a customer involving a member or person associated with a member,” and that there were a number of passages in the September 22 letter that appeared to qualify as “grievances.” But it is also the case that under that same rule, the requirement is for members such as Merrill Lynch to report to NASD “statistical and summary information regarding customer complaints.” Inclusion of the September 22 letter as part of a statistical summary would not have provided notice to any regulatory authority or anyone else about the fact that the Benistar Property accounts contained client funds that were being improperly traded.

Enright’s notes, taken contemporaneously with the telephone conversation, state on this point as follows:
We [the three PaineWebber employees] then had conference call w/Gary [Stern] to discuss Daniel Carpenter, Benistar . . . Gary also told us Dan Carpenter is tax attorney, handles estate planning, pension management, [plus] acts as an attorney for real estate dev. companies. Acts as 3rd party liason [sic.] for real estate transactions
(Ex. 112.)

It would seem reasonably consistent with such a business to have numerous transfers of funds to and from lawyers’ client accounts: transfers of funds into the Benistar Property account from purchasers’ lawyers reflecting real estate sales by Benistar Property, and transfers of funds out of the account to the sellers’ lawyers reflecting Benistar Property real estate purchases.

The plaintiffs point to various provisions in the Merrill Lynch policy manual (ex. 71 A, ex. 71) as indicating that the Merrill Lynch brokers were aware of the need to focus on suspicious signs relating to wire transfers and other conduct by customers, and that many of those signs applied to Benistar Property and Carpenter. They argue that the Merrill Lynch employees’ lack of concern about these signs permitted the inference that the employees knew Benistar Property and Carpenter were engaged in wrongdoing. I do not consider this a reasonable inference to draw from the policy manual evidence.

Boston v. Santosuosso, 307 Mass. 302, 349 (1940).