Neel, Stephen E., J.
In 2006, defendant Marvin R. Bodden (Bodden) left the employ of plaintiff People’s Choice Mortgage, Inc. (PCM) and joined defendant Premium Capital Funding, LLC (Topdot). PCM, alleging that Bodden violated a non-competition agreement and that Topdot participated in Bodden’s wrongful conduct, brought this action against both.[1] Topdot asserted a counterclaim against PCM, and a cross claim against Bodden for indemnification. The claims were tried without jury.
*583 FINDINGS OF FACT
On the basis of the credible evidence, and inferences reasonably drawn therefrom, the Court makes the following findings.
I. PCM’s Employment of Bodden
In April 2003, PCM, a licensed mortgage brokerage firm headquartered in Randolph, Massachusetts, hired Bodden as an Account Executive, a sales position involving recruiting and servicing residential mortgage loan prospects and clients. Bodden was sophisticated generally in business, having worked in the banking industry in Grand Cayman. He had little or no experience in the residential mortgage business.
Bodden had applied to PCM in response to an advertisement for the position. PCM’s owner and president, David Fasano (Fasano), hired Bodden specifically to expand PCM’s business into the Spanish-speaking market, utilizing Bodden’s facility in Spanish.
Bodden signed a “Loan Partner Contract” with PCM dated April 16, 2003 (Loan Partner Contract). The Loan Partner Contract contains provisions protecting PCM’s leads and other proprietary information. For so long as the Loan Partner Contract was the sole instrument governing Bodden’s relationship with PCM, Bodden’s position was probably that of independent contractor, insofar as that contract provided in Section Ten that “this Agreement [as opposed to Bodderis employment] is ‘AT WILL’ and may be terminated by either party at any time without notice.” Bodderis compensation under the PCM Loan Partner Contract was set, in “Exhibit ‘A’ Compensation Agreement,” on a sliding scale, as follows:
The company shall pay the Loan Partner in the following manner on mortgage loans closed and funded in that current month:
$0 to $500,000 25% of company’s gross points (front & back)
$500,000 to $1,000,000 27.5% of company’s gross points (front & back)
$1,000,000 and up 30% of company’s gross points (front & back)
In any event, Bodden became an at-will employee in July 2003 when he signed a “Non Competition, Confidentiality and Nondisclosure Agreement” (2003 PCM Agreement), prohibiting him from, inter alia, competing with PCM in Massachusetts for one year following the termination of his employment with PCM. At that time, PCM began paying Bodden a salary in addition to his commission, to compensate him for managerial tasks he was assuming, and to supplement his relatively low commission scale.
On August 30, 2004, Bodden signed another non-competition agreement (2004 PCM Agreement), which amended the non-competition geographical restriction to 50 miles “from any licensed branch office of PCM . ..” In both the 2003 and 2004 PCM Agreements, Bodden agreed that he was an at-will employee, and that the consideration for his executing the agreement included his continued employment on an at-will basis. The 2004 PCM Agreement recites, as additional consideration, “one paid day-off to be used within ninety (90) days of the date of this agreement . . .” Paragraph 2 of the 2004 PCM Agreement provides that Bodden agrees “not to disclose [PCM’s] confidential or proprietary information, whether during or after the termination of my employment, ... or to use [it] directly or indirectly” without PCM’s permission or as required in the course of his employment at PCM. Paragraph 5 provides that “[d]uring the period of my employment with [PCM] and for a period of one (1) year after termination of such employment..., I agree that I will not, whether alone or as . . . employee ... or otherwise, enter or engage in any phase of the mortgage brokerage business as . . . loan originator ... on my own or for or on behalf of any other competitor of [PCM].” Paragraph 6 provides that “during the period of my employment with [PCM] and for a period of one (1) year after termination of such employment . . . , I will not directly or indirectly, either for myself or for any other enterprise, solicit, divert or take away or attempt to solicit, divert or take away, any of [PCM’s] actual or prospective customers ... in existence at the termination of such relationship.”
Bodden brought with him no “book” of business. Fasano directed Bodden to develop an advertising presence on Spanish radio stations, financed those advertisements, and reimbursed Bodden for participation in the Greater Boston Hispanic Lion’s Club, which Bodden joined in early to mid-2004, while employed at PCM. At PCM’s instance, Bodden also joined chambers of commerce. PCM paid for marketing activities such as television and newspaper advertising, and some home-buying seminars. PCM encouraged Bodden to undertake each of those activities for the purpose of generating leads.
Bodden was the person at PCM to whom Spanish-speaking prospects were directed. Bodden began on a salaried basis and, after fine-tuning the radio ads, began to generate a significant number of leads for PCM. Bodden later had a management position at PCM, and admitted at his deposition (although denying at trial) that he oversaw the distribution of leads at PCM.
Ariosto Rodriguez (Rodriguez), a. PCM employee, was assigned to work with Bodden in developing the Spanish-speaking market. Rodriguez came to believe that Bodden was cherry-picking prospects, and animosity developed between them. On Bodden’s recommendation, Fasano fired Rodriguez in December 2005. Subsequently, Rodriguez returned to PCM on occasion as an independent contractor offering leads.
*584 n. PCM’s Confidential Customer Lead Information
PCM’s customer “leads,” identifying actual or potential customers’ names, telephone numbers, and information about customers’ mortgage needs, were written on company paper documents, and recorded in PCM’s electronic database. PCM treats its customer leads as confidential information. Only employees with a need to know the information are provided access to the documents.
PCM also keeps files on its customers, including credit applications, credit reports, and other documents necessary for the processing of mortgage loan applications. PCM has a strict policy against customer leads and files leaving the office, and so informs its employees. A customer’s loan file contains all of PCM’s information on that customer, and is available to the loan processor and the sales representative, and their supervisor. While the loan is pending, the file is kept in a file cabinet; once the loan is closed, the file is sent to a restricted file room, and is available to employees only on a need-to-know basis. PCM had a sign-in, sign-out system for its paper client files.
In December 2005, PCM switched its customer database software from a system called Calyx to one called Genesis. The Calyx software was at that point frozen, ending access to that system. Bodden was very upset at the switch because he was more comfortable with the Calyx system, and in ensuing weeks repeatedly asked Yefim Sigal (Sigal), PCM’s operations manager, for access to Calyx. Fasano finally instructed Sigal to give Bodden access to Calyx. Hard copies of the documents from which the customer database was derived were kept under lock and key in the basement of PCM’s office. Only Fasano, his father, and compliance attorney Ken Tocci had keys; Bodden had a key to the building, but not to the basement.
III. Topdot’s Employment of Bodden
On March 17, 2006, without notice to PCM, Bodden signed a “Loan Officer Agreement” with Topdot, and on that date became a Topdot employee at Topdot’s Burlington, Massachusetts, office (Topdot Agreement). In that agreement, Bodden “covenants and agrees that he . . . will not during the course of his . . . employment under this Agreement.. . render services to any other business . . . which is competitive with” Topdot. Topdot Agreement, Sec. 2.(d); see also Sec. 7.(b). Section 7.(c) provides that Topdot “recognizes that [Bodden] brought certain clients to the Company at the time he commenced employment as a result of [Bodden's] efforts alone. Those clients are identified in Exhibit C to this Agreement.” (Emphasis supplied.) Exhibit C is blank. In Section 8.(a)(iv), Bodden warrants that he “will not engage in . . . any acts involving fraudulent or dishonest behavior, in his capacity as an employee of [Topdot].” Section 8.(b) requires Bodden to “indemnify [Topdot] from and against any responsibility arising out of [Bodden’s] own violation or breach of the warranties and representations set forth in this Section 8.” In Section 9.(1), Bodden agrees to “indemnify and hold harmless [Topdot] . . . from all claims . . . whatsoever arising from . . . any dishonest or fraudulent act, representation, defalcation of law, a violation of [Bodden’s] duty of loyally to [Topdot], or any other violation by [Bodden] of. .. this Agreement.”
When it hired Bodden, Topdot was aware (from Bodden’s “Application for Employment”) that Bodden’s “present” employer was PCM. Topdot was not aware, however, of Bodden’s obligations and restrictions under the 2004 PCM Agreement. Indeed, on March 17, 2006, as part of his application for employment, Bodden signed an acknowledgment that he was under no such restrictions. Topdot had no actual notice that Bodden continued his employment with PCM beyond March 17, and was entitled to conclude, based upon the Topdot Agreement and the acknowledgment just referred to, that Bodden had left PCM upon becoming a Topdot employee.
On April 12, 2006, Bodden voluntarily gave Fasano two weeks notice that he was terminating his employment with PCM. Upon receiving that notice, Fasano wanted Bodden to leave that day, but acceded to Bodden’s request, purportedly based upon Bodden’s personal financial situation and pending divorce, for two additional weeks. Bodden told Fasano that he planned to sell commercial real estate, and hoped to bring residential loan leads to PCM as he developed them. Bodden did not inform Fasano that he was in fact already an employee of a PCM competitor, Topdot, because “he did not need to know.”
Thus, through dupliciiy, in violation of both the 2004 PCM Agreement and the Topdot Agreement, and unbeknownst to either PCM or Topdot, Bodden arranged to have himself employed simultaneously by both from March 17 through April 26, 2006, a period of nearly six weeks. Before or during that period, Bodden collected PCM documents containing customer lead information for the purpose of continuing to solicit those customers while he was at Topdot. By his conduct, Bodden violated both his contractual duties to safeguard PCM’s confidential information while he was at PCM, his non-competition agreement, and the covenant of good faith and fair dealing implied in the 2004 PCM Agreement. In addition, his conduct, together with his testimony at trial referred to below, renders him in the Court’s view untrustworthy in other matters at issue in this case touching his personal interests.
As it turned out, Bodden’s compensation for closing loans at Topdot was much better than at PCM. At Topdot, Bodden was entitled to 60 to 65% of commissions earned on loans he generated, roughly twice his commission rate at PCM.
IV. Topdot’s Knowledge of Bodden’s Duplicity
Beginning in about May 2006, Ana Portillo (Portillo) was Bodden’s assistant at Topdot for two to three months. Michael Epstein (Epstein), Topdot’s Rule *585 30(b)(6) designee, testified that Portillo was a Topdot loan officer. The Court concludes that she was at least a Topdot employee, providing sales and administrative assistance to Bodden and his team, which Epstein supervised. Her desk was in Bodden’s office.
Bodden gave Portillo the documents comprising Exhibit 5, which were among documents he had brought with him from PCM, and which contained customer information regarded by him and by PCM as customer leads. Bodden instructed Portillo to transcribe the information in the documents and distribute it to Topdot loan officers. Portillo did so, and distributed the leads to several loan officers at Topdot, including Rodriguez. Exhibit 5 is a package of PCM leads which Bodden gave to Portillo as leads for Rodriguez. To the extent that the pages of Exhibit 5 (variously titled “PCM Loan Activity Log,” “PCM Weekly Leads Tracking Form,” etc.) are dated, they are from 2004 and 2005. Portillo identified the handwriting on the first page (“Leads for Ariosto”) as her own. Rodriguez told Portillo that the leads were from PCM, a conclusion which Portillo herself had probably already reached.
Rodriguez had just begun employment at Topdot as a loan officer, having been employed at a different mortgage broker after his employment at PCM ended. At Topdot, Bodden showed Rodriguez documents he had brought with him from PCM. Some of the documents were headed “People’s Choice Mortgage,” and contained names and identifying information of prospects and customers.
Among the documents from Bodden which Portillo saw were documents containing the words “radio program,” and names designated as “call-ins.” When she queried Bodden about those, he told her that when he was at PCM he had done programs on the radio, and that the lead documents she was inquiring about had come from those promotions.
Bodden denied at trial that Portillo was his assistant, a blatant falsehood. He testified that he provided financial, professional, and personal assistance to Portillo; he testified also that she sought a sexual relationship with him, which he rejected. On cross examination, counsel presented testimony from Bodden’s May 8, 2007 deposition, in which Bodden agreed that Portillo was “credible,” and from his June 7, 2007 deposition, in which Bodden stated that he had “no idea” why Portillo would say that he had asked her to hand out leads he had brought from PCM. From that testimony counsel argued that Bodden’s trial testimony was a contrived response to Portillo’s damaging testimony in plaintiffs case in chief. The Court agrees, and concludes that Bodden attempted at trial to damage Portillo’s credibility by falsely portraying her as a rejected would-be lover.
Epstein was director of operations and thereafter co-branch manager, with Teresa McNeil-Balian (McNeil-Balian), at Topdot’s Burlington office. He supervised Bodden’s activities on a daily basis. His office was directly in front of the team where Portillo handed out the PCM radio leads, and he often went into Bodden’s office. While Rodriguez warned Epstein about Bodden’s lack of trustworthiness, he did not specifically disclose that Bodden was using PCM information to develop business for Topdot. Nevertheless, the Court concludes that soon after it hired Bodden, Topdot had constructive knowledge that Bodden was using PCM information for Topdot’s and his own benefit.
In early July 2006, Rodriguez called Fasano to inform him that Bodden was working at Topdot and had “stolen” from PCM documents containing PCM leads. At a subsequent meeting, Rodriguez gave to Fasano copies of documents which Rodriguez had received from Bodden. Fasano called Bodden and left a voice message directing him to return the PCM documents. Bodden returned neither the call nor the documents.
In or just after mid-July, Fasano called McNeil-Balian at Topdot, informing her of what he had learned and requesting that Topdot “just return the documents.” Although McNeil-Balian told Fasano that the owner of Topdot would agree, and would not tolerate Bodden’s bringing of PCM documents, no one from Topdot’s corporate office returned Fasano’s call. Shortly thereafter, McNeil-Balian told Fasano that she had forwarded his request, but that the matter was “out of my hands.”
Fasano then hired counsel, who on July 26 (via fax) notified Topdot that Bodden had misappropriated PCM’s trade secrets, and was soliciting PCM customers in violation of the 2004 PCM Agreement, a copy of which was attached to the letter. Topdot’s in-house counsel responded by letter of August 2, 2006, essentially passing along what Topdot represented to be Bodden’s denial of PCM’s claims, which Topdot adopted as its own position.
Topdot’s August 2 response was at best disingenuous. Any reasonable investigation would have revealed what Topdot had constructively known, through branch manager Epstein, since April, when Bodden closed the first of his loans with PCM clients or prospects.
V. The Disputed Loans
Fasano instructed Sigal to investigate the loans which Fasano suspected Bodden had wrongfully taken to Topdot. Sigal identified nine loans which represented customers or prospects of PCM, and as to which Topdot had closed loans after Bodden arrived there (disputed loans). Sigal matched the customer names on the disputed loans against PCM’s database and third-parfy vendors. He determined, and the Court finds, that all of the disputed loans involved prior customers of PCM or leads that were in PCM’s system. PCM paid for a credit report for each of the *586 disputed loans. PCM had previously closed loans for some of the customers for whom disputed loans were closed by Topdot. The disputed loans are listed below, by type of loan and date of closing (see Bodden’s Answer to PCM’s Interrogatory No. 12, and Trial Ex. 23[2]), together with the total amount of commissions and fees earned thereon by Topdot, the amount paid to Bodden and the percent which that amount represents of Topdot’s total commission (net of fees), and the Court’s findings regarding the genesis of the client.
Bodden closed the following loans at Topdot (disputed loans):
a. Carlos and Jacqueline Montoya (Montoya loan). Refinance loan of $530,000 closed by Topdpt on or about June 29, 2006; revenue to Topdot: $6,250; commission to Bodden: $3,153 (60%). Bodden met Carlos Montoya through the Lion’s Club while he was working for PCM; in 2005 PCM paid for credit checks on the Montoyas and had previously financed a property for them. Montoya, an accountant, referred a number of his clients to Bodden at PCM. Because Montoya became a client of Bodden and PCM through Bodden’s fulfillment of PCM’s direction to develop contacts for PCM by joining the Lion’s Club, the Court concludes that the Montoyas were clients developed under the direction of and with investment by PCM. In view of Bodden’s taking and use at Topdot of lead documents from PCM, the Court concludes that Bodden improperly used PCM’s lead information on the Montoyas to solicit their business for, and close their loan at, Topdot.
b. Esteban Quintana (Quintana loan). Refinance loan of $450,000 closed by Topdot on or about May 26, 2006;[3] revenue to Topdot: $14,495; commission to Bodden: $8,775 (65%). Quintana was a long-time friend of Bodden’s before Bodden’s employment with PCM; at Bodden’s request, he appeared in a PCM commercial directed at the Spanish-speaking market. Bodden had closed a loan for Quintana while he was at PCM. Quintana referred prospects to Bodden at PCM. Because his relationship with Bodden preceded Bodden’s employment with PCM, the Court concludes that Quintana was a client developed by Bodden, without significant investment by PCM.
c. Esteban Vasquez (Vasquez loan). Refinance loan of $290,700 closed by Topdot on or about April 10, 2006 (while Bodden was still employed by PCM); revenues to Topdot: $6,809; commission paid to Bodden: $3,488 (60%). Vasquez was referred to Bodden at PCM by Montoya, and Bodden had closed a loan for Vasquez while at PCM. For the same reasons which lead the Court to conclude that Montoya was a client of PCM, the Court concludes that Vasquez was also a client of PCM. In view of Bodden’s taking and use at Topdot of lead documents from PCM, the Court concludes that Bodden improperly used PCM’s lead information on Vasquez to solicit his business for, and close his loan at, Topdot. In any event, Bodden’s duplicity in closing the Vasquez loan at Topdot before he had even given notice to PCM of his departure vitiates any claim by Bodden to Vasquez’s business.
d. Doris Cooper (Cooper loan). Purchase loan of $292,500 closed by Topdot on or about August 25, 2006; revenues to Topdot: $9,725; commission paid to Bodden: $5,238 (60%). Bodden asserts that Cooper and her mother Georgia Young came to him “through Sandi Robinson and not through any paid marketing effort of’ PCM; he identifies Robinson as a “former employee of’ PCM. Bodden’s Answer to Interrogatoiy No. 13. There is no credible basis upon which to conclude that Cooper became a prospect of PCM through Bodden’s efforts or personal contacts; in view of Bodden’s taking and use at Topdot of lead documents from PCM, and the lack of any corroboration that Robinson was the source of the Cooper loan for Topdot, the Court concludes that Bodden improperly used PCM’s lead information on Cooper to solicit her business for, and close her loan at, Topdot.
e. Jocelyn Cetoute (Cetoute loan). Refinance loan of $250,750 closed by Topdot on or about July 25, 2006;[4] revenues to Topdot: $6,010; commission paid to Bodden: $3,009 (65%). Bodden had refinanced a loan for Cetoute while at PCM. Bodden avers that Cetoute “came through a personal referral and not through any paid marketing effort of People’s Choice . . . They [sic] called me [at Topdot] and I did not solicit them.” Bodden Answer to PCM’s Interrogatoiy No. 13. Bodden states in that answer that even after he suggested that Cetoute go to PCM’s office, which was close to where she lived, “they [sic] said they did not want to go there and asked if I could assist them.” The Court concludes that Bodden’s telling Cetoute that she “could go to People’s Choice” is evidence that he did not consider her to be “his” client as opposed to a client of PCM. Nor is there a credible basis for concluding that Cetoute became a prospect of PCM through an unnamed “personal referral.” In view of Bodden’s taking and use at Topdot of lead documents from PCM, and the lack of any corroboration that “a[n unnamed] personal referral” was the source of the Cetoute loan for Topdot, the Court concludes that Bodden improperly used PCM’s lead information on Cetoute to solicit her business for, and close her loan at, Topdot.
f. Stanley and Tacita Porter (Porter loan). Refinance loan of $310,250 closed by Topdot on or about May 24, 2006; revenues to Topdot: $7,195; commission paid to Bodden: $3,720 (60%). Bodden states, in answer to Interrogatoiy 13, that the Porters “were a personal referral,” again unnamed, while he worked at PCM; that they “called me in the week after I gave my notice [i.e., after April 12, 2006] and I told them that I was leaving and that someone else could help them. After several weeks to a month, they called me again and said that no one had called them and asked if I could refinance them (I have a letter to that effect).” The Court concludes that Bodden’s offer to have *587 “someone else” at PCM help the Porters is evidence that he did not consider them to be “his” clients as opposed to clients of PCM; in any event, the Court finds it not credible that PCM would not have returned the Porters’ call and offered to handle the refinancing for them. Accordingly, the Court concludes that the Porters were a lead developed through PCM’s efforts and investment in Bodden, and not through Bodden’s own personal contacts as he alleges. In view of Bodden’s taking and use at Topdot of lead documents from PCM, and the lack of any corroboration that “a[n unnamed] personal referral” was the source of the Porter loan for Topdot, the Court concludes that Bodden improperly used PCM’s lead information on the Porters to solicit their business for, and close their loan at, Topdot.
g. Conrado Sical (Sical loan). Refinance loan of $513,000 closed by Topdot on or about July 14, 2006;[5] revenues to Topdot: $11,255; commissions paid to Bodden: $6,156 (60%). In his answer to Interrogatory 13, Bodden avers that Sical was a “personal referral from an [unnamed] accountant in the winter of 2004.1 refinanced them in the winter of 2006 while at People’s Choice.” There is no credible basis for concluding that Sical became a prospect of PCM through Bodden’s efforts or personal contacts; in view of Bodden’s taking and use at Topdot of lead documents from PCM, and the lack of any corroboration that a personal contact of Bodden was the source of the Sical loan for Topdot, the Court concludes that Bodden improperly used PCM’s lead information on Sical to solicit his business for, and close his loan at, Topdot.
h. David White (White loan). Loan of $370,000 closed by Topdot on or about June 2, 2006; revenues to Topdot: $9,275; commission paid to Bodden: $4,968 ($60%). Bodden does not refer to the White loan in his answers to interrogatories or in his trial testimony. Accordingly, in view of Bodden’s taking and use at Topdot of lead documents from PCM, and the lack of any evidence that any effort or personal referrals of Bodden were the source of the White loan for Topdot, the Court concludes that Bodden improperly used PCM’s lead information on White to solicit his business for, and close his loan at, Topdot.
i. Medina Jones (Jones loan). Loan of $276,000 closed by Topdot on or about June 8, 2006; revenues to Topdot: $5,415; commission paid to Bodden: $2,652 (60%). Bodden refinanced Jones while at PCM; she was in the process of closing a loan at PCM when Bodden left PCM, and while Bodden was employed by both PCM and Topdot. Bodden avers that “I knew I was leaving and left this [i.e., Jones] file on my desk. I pointed this out to both David Fasano and processing manager Steve Demello, that they needed to finish the loan. From March to May, apparently no one contacted Ms. Jones.” Answer to Interrogatory No. 13. The plain implication of Bodden’s answer is that he told Fasano and DeMello in March that they “needed to finish” the Jones loan. The Court finds Bodden’s statements not credible, because he did not give his notice to Fasano until April 12; it would make no sense for Bodden to have told Fasano, in March, before he gave notice, that others at PCM should “finish the loan.” Bodden told Epstein that the Jones loan had been closing at PCM, and that the Jones loan as well as all loans Bodden closed at Topdot were for personal friends and people he knew, or who had been referred to him by people he knew. In view of the foregoing, and of Bodden’s taking and use at Topdot of lead documents from PCM, the Court concludes that Bodden improperly used PCM’s lead information on Jones to solicit her business for, and close her loan, at Topdot.
At Topdot in 2006, loans would take from a few weeks to a few months to close; the average was about thirty days. Bodden began closing loans at Topdot in April 2006.
Of the nine disputed loans, only two — the Cetoute and Cooper loans — were closed after Topdot received actual notice, in or just after mid-July, that Bodden had brought lead documents from PCM for use at Topdot. The other seven loans were closed after Topdot had constructive notice of that fact in April 2006, and before Topdot had actual notice.
Topdot admits that “PCM would only have suffered damages if it could show that the Topdot loans made by Mr. Bodden were closed from PCM leads.” Topdot’s Proposed Findings, para. 29.
The disputed loans generated total revenue of $76,429 for Topdot, of which Topdot paid Bodden commissions of $41,159. The total revenue which Bodden’s loans (including the disputed loans) generated for Topdot is $120,137. The Court infers, from the evidence, that Topdot and PCM, two competitors in a competitive industry, charged comparable loan application and processing fees (see, e.g., Ex. 23) and commissions (compare Topdot’s predominant 2% “broker fees” on the undisputed loans, id., with PCM’s “Loan Activity Logs” attached to Fasano’s Affidavit, documents nos. 000017 and 000020 (“2 pts.” charged on proposed loans)).
VI. Topdot’s Counterclaim
Topdot’s counterclaim is based upon its allegation that a loan known as the Perez/Messenger Loan was closed by an entity in Irvine, California named “People’s Choice Home Loan, Inc.” There is no evidence that that entity is connected to PCM in any manner other than the similarity in names. •
RULINGS OF LAW
PCM may recover, as to any of its claims, only to the extent that it has proved causation and damage. As found above, the scope of PCM’s harm is defined by the nine disputed loans which PCM has alleged, through Sigal’s testimony and other evidence, were for customers or prospects of PCM; PCM’s argument for *588 any further damage as to other actual or potential customers is based, in the Court’s view, on speculation. Thus, although the Court has found that Bodden took confidential information for other PCM customers or prospects and distributed it to employees of Topdot, PCM has not proved that such acts caused it any damage — other than as to the disputed loans — because PCM has not shown by a preponderance of the evidence that it lost business from those customers. Similarly, PCM has not proved that any of the loans which were closed by Bodden at Topdot, and do not appear on Sigal’s list of the nine disputed loans, were for PCM customers or prospects. Accordingly, the Court will address the various counts only with regard to the nine disputed loans, and the customers they represent, as to which PCM has presented evidence of causation and harm.
I. PCM’s Claims against Bodden
A. Breach of Contract (Count I)
Although Bodden testified that he was unaware of the restrictive provisions in the 2004 PCM Agreement at the time he signed it, the Court does not credit that testimony, particularly given Bodden’s sophistication in business generally. Accordingly, to the extent that the various restrictive covenants in the 2004 PCM Agreement are enforceable, Bodden is bound by them.
PCM alleges that Bodden violated the 2004 PCM Agreement in at least three ways: by becoming employed by Topdot for a period of six weeks while he was still employed by PCM, and within one year thereafter, in violation of the non-competition covenant (paragraph 5); by taking to Topdot confidential customer documents from PCM, and distributing those documents to Rodriguez and others at Topdot for the purpose of generating customers for Topdot, in violation of the provisions for safeguarding confidential or proprietary information (paragraphs 2 and 3); and by soliciting and closing loans at Topdot for actual or prospective customers of PCM, in violation of the non-solicitation covenant (paragraph 6).
The Court has found, as noted above, that Bodden violated his contractual duties to safeguard PCM’s confidential information because, during his employment with PCM, he collected PCM documents containing customer lead information for the purpose of continuing to solicit those customers while at Topdot. The Court has also found that PCM has presented evidence of causation and harm only as to the nine disputed loans. While the documents submitted as evidence by PCM to show that Bodden took confidential PCM information to Topdot (Exhibit 5) do not contain any information relating to the disputed loans, the facts found above support a reasonable inference that Bodden also took confidential information relating to the disputed loans. On the basis of all the evidence, the Court makes that inference, and concludes that Bodden violated paragraphs 2 and 3 with respect to the disputed loans.
With regard to PCM’s claims under the non-competition and non-solicitation provisions of the 2004 PCM Agreement, the Court looks to the standards which it is to apply in determining the enforceability of such covenants:
Noncompetition agreements are generally enforceable so long as they are reasonable under the circumstances. All Stainless, Inc. v. Colby, 364 Mass. 773, 778 (1974). Marine Contractors Co. v. Hurley, 365 Mass. 280, 289 (1974). Wells v. Wells, 9 Mass.App.Ct. 321, 323 (1980). In determining whether a covenant will be enforced in whole or in part, the reviewing court must consider whether (1) it protects the legitimate business interest of the employer against harmful conduct of the former employee; (2) it is supported by consideration; (3) the time, space, and geographical restraints imposed on the former employee are reasonable in the circumstances; and (4) the covenant is consistent with public policy. See All Stainless, Inc. v. Colby, supra; Blackwell v. E.M. Helides, Jr., Inc., 368 Mass. 225, 228-29 (1975); Whitinsville Plaza, Inc. v. Kotseas, 378 Mass. 85, 102-03 (1979). See also Boulanger v. Dunkin’ Donuts Inc., 442 Mass. 635, 639 (2004).
Runway Salon, Inc. v. Garey, 68 Mass.App.Ct. 1105 (2007) (unpublished decision). Here, the first of the four factors listed presents the most significant issue. In light of the evidence, the Court concludes that the non-competition and non-solicitation covenants reasonably protect the legitimate business interests of PCM against the harmful conduct of Bodden.
As found above, Bodden had no previous experience in the residential mortgage brokerage industry, and arrived at PCM with no “book” of business which he can claim to have developed without the assistance of PCM. Rather, with the exception of family and personal friends, Bodden developed customers and prospects for PCM by following PCM’s instructions about how to develop business, through PCM’s reimbursement of costs which Bodden incurred in the course of his participation in social and business groups, and through PCM’s providing of funds for and sponsoring of television and radio advertisements, and marketing seminars, in which Bodden participated and from which he benefited. Bodden’s personal attributes and industry played an important role in his production of business for PCM, but PCM’s investment in him, through its support of his marketing and other business development efforts, was substantial enough to give PCM a legitimate interest in protecting that investment, and the business it generated.
Nor are the restrictive covenants which PCM seeks to enforce unreasonable in time, space, or geographical restraints. In view of PCM’s substantial investment, through Bodden and otherwise, in the development of its Spanish-speaking market, and the importance to PCM of repeat business and referrals *589 from existing customers, the Court concludes that the one-year, fifty-mile restrictions are neither unreasonable nor unfair to Bodden. For the same reasons, it is neither unreasonable nor unfair to prohibit Bodden from soliciting the PCM customers represented on the list of disputed loans, with the exception of the Quintana loan. PCM, which admits that Quintana was a long-time friend of Bodden’s before it hired Bodden, can claim no particular investment in the development of Quintana as a customer.
Accordingly, under familiar contract principles, PCM may recover from Bodden its lost profits with regard to the eight disputed loans as to which the Court has found him in breach.[6] See Frank D. Wayne Associates, Inc. v. Lussier, 16 Mass.App.Ct. 986, 988 (1983) (no requirement that “a more solid foundation in fact is needed to recover damages for breach of a covenant not to compete than for breaches of other contracts . .. As in other cases where lost profits have to be valued, . . . mathematical accuracy of proof is not required, and estimates are in order”). The evidence at trial permits the Court to make findings regarding PCM’s expected revenues (commissions and fees) generated by each loan, and (as calculated below) the commission it would have paid to Bodden as to each. The Court has not found direct evidence of PCM’s expected profit margin on the disputed loans, other than its gross profit after paying Bodden his commission. As determined below, however, the Court concludes that the net commission to PCM, less expected application and processing fees, provides a sufficient approximation of PCM’s profit on each loan (and probably a conservative one, in view of PCM’s expectation of repeat business from some or all of its customers lost because of Bodden’s breach).
Having found that the revenues from the eight disputed loans would have been comparable whether they were closed at PCM or Topdot, the Court will for each loan (1) project the commission which Bodden would have earned had the loan closed at PCM (i.e., multiply his actual commission from Topdot by the fraction of which the numerator is his PCM commission rate and the denominator his Topdot commission rate); (2) subtract the result from the revenue received by Topdot; and (3) further subtract application and processing fees, to arrive at a reasonable approximation of PCM’s lost profit as to each loan.
(1)As found above, Bodden’s commission at PCM was on a sliding scale, depending upon the total amount of his loan closings for PCM in a given month ($0 to $500,000: 25%; $500,000 to $1,000,000: 27.5%; $1,000,000 and up: 30%). The disputed loans and amounts which Bodden closed each month at Topdot, and Bodden’s corresponding commission on those loans, are as follows:
April 2006: Vasquez ($290,700); commission rate: 25%
May 2006: Quintana[7] ($450,000), Porter ($310,250); commission rate: 27.5%
June 2006: Montoya ($530,000), White ($370,000), Jones ($276,000); commission rate: 30%
July 2006: Sical ($513,000), Cetoute ($250,750); commission rate: 27.5%
August 2006: Cooper ($292,500); commission rate: 25%
Using those projected PCM commission rates, and multiplying Bodden’s actual commission from Topdot by the fraction of which the numerator is the PCM commission rate, and the denominator his Topdot commission rate, results in the following commission amounts to Bodden had he closed the loans at PCM:
Montoya loan: $3,153 x 30%/60% = $1,577 PCM commission to Bodden
Vasquez loan: $3,488 x 27.5%/60% = $1,599 PCM commission to Bodden
Cooper loan: $5,238 x 25%/60% = $2,183 PCM commission to Bodden
Cetoute loan: $3,009 x 27.5%/65% = $1,273 PCM commission to Bodden
Porter loan: $3,720 x 27.5%/60% = $1,705 PCM commission to Bodden
Sical loan: $6,156 x 27.5%/60% = $2,822 PCM commission to Bodden
White loan: $4,968 x 30%/60% = $2,484 PCM commission to Bodden
Jones loan: $2,652 x 30%/60% = $1,326 PCM commission to Bodden
(2) Subtracting the above results from the revenues received by Topdot for each respective loan yields the following net revenues which PCM reasonably expected to receive under its contract with Bodden, and lost because of his breach:
Montoya loan: $ 6,250 — $1,577 = $ 4,673 lost net revenue to PCM
Vasquez loan: $ 6,809 — $1,599 = $ 5,210 lost net revenue to PCM
Cooper loan: $ 9,725 — $2,183= $ 7,542 lost net revenue to PCM
Cetoute loan: $ 6,010 — $1,273 = $ 4,737 lost net revenue to PCM
Porter loan: $ 7,195 — $1,705 = $ 5,490 lost net revenue to PCM
Sical loan: $11,255 — $2,822 = $8,433 lost net revenue to PCM
White loan: $ 9,275 — $2,484 = $ 6,791 lost net revenue to PCM
Jones loan: $ 5,415 — $1,326 = $ 4.089 lost net revenue to PCM
Total: $46,965 lost net revenue to PCM
(3) From the $46,965 lost net revenue to PCM, the Court further subtracts $995 for each loan (derived from the amounts charged by Topdot, which the Court has found comparable to what PCM would have charged, of a $695 application fee and $300 process *590 ing fee), or $7,960, resulting in total lost profits to PCM of $39,005 caused by Bodden’s breach of contract.
B. Breach of Covenant of Good Faith and Fair Dealing (Coúnt II)
“Every contract implies good faith and fair dealing between the parties to it.” Anthony’s Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 471 (1991). “The implied covenant of good faith and fair dealing provides that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.” Id. Here, Bodden knowingly violated the confidentiality provision, the non-competition provision, and the non-solicitation provision by taking PCM documents to Topdot for the purpose of soliciting PCM’s customers to benefit himself. In doing so, Bodden clearly injured the rights of PCM to reap the benefits of the 2004 PCM Agreement, i.e., making money on the leads developed by Bodden using PCM’s resources. The Court has calculated above the amounts representing the fruits of the 2004 PCM Agreement of which PCM was deprived.
C. Breach of Fiduciary Duty (Count III)
“Employees occupying a position of trust and confidence owe a duty of loyalty to their employer and must protect the interests of the employer.” Chelsea Indus., Inc. v. Gaffney, 389 Mass. 1, 11 (1983). See Meehan v. Shaughnessy, 404 Mass. 419, 438 (1989) (finding law firm associate occupied position of trust sufficient to justify imposition of duty of loyalty because he had “access to clients and information concerning clients”). An at-will employee may properly plan to go into competition with his employer and may take active steps to do so while still employed. Augat v. Aegis, Inc., 409 Mass. 165, 172 (1991).[8] There are, however, certain limitations on the conduct of an employee who plans to compete with his employer. Id. An employee may not solicit his employer’s customers while still working for his employer, appropriate his employer’s trade secrets, or carry away certain information, such as lists of customers. Id. at 172-73; see also Quinn v. Mar-Lees Seafood, 69 Mass.App.Ct. 688, 700 (2007) (judge correctly charged the jury that plaintiff, while employed by defendant, could not permissibly solicit defendant’s customers). An employee certainly cannot act for his future interests at the expense of his employer by entering into a course of conduct designed to hurt his employer. Augat, 409 Mass. at 173.
The Court concludes that Bodden breached the duty of loyally to PCM when he closed the Vasquez loan for Topdot while he was still employed by PCM. The duly of loyalty, however, ends when the employment ends; once the employment relationship has terminated, the former employee’s only duty to the former employer is to refrain from misappropriation of its trade secrets. See generally Augat, 409 Mass. at 172. It is undisputed that the eight other loans were closed after Bodden left the employ of PCM. Thus, the Court will address the conduct related to those eight loans below with respect to the misappropriation of trade secrets claim. If PCM can show that Bodden misappropriated trade secrets and harm resulted, it can recover under that theory; it cannot recover for breach of a fiduciary duty for post-employment conduct.
Bodden’s conduct with regard to the Vasquez loan caused PCM to lose the financial benefits of that loan. An employee who breaches his fiduciary duty can be required to forfeit his compensation for the period in which he was disloyal. Chelsea Indus., Inc. v. Gaffney, 389 Mass. 1, 12 (1983); see Berish v. Bornstein, 437 Mass. 252, 271-72 (2002) (recognizing disgorgement of ill-gotten profit as remedy for a breach of fiduciary duty). These damages are cumulative of other damages available to the employer. See Chelsea Indus., Inc., 389 Mass. at 13 (noting equitable nature of remedy of restoring compensation for breach of fiduciary duty). Thus, PCM may recover the $3,488 Bodden received as commission from closing the Vasquez loan at Topdot.
II. PCM’s Claims against Bodden and Topdot A. Conversion (Count IV)
“One who intentionally or wrongfully exercises acts of ownership, control or dominion over personal property to which he has no right of possession at the time is liable for the tort of conversion.” Abington Nat’l Bank v. Ashwood Homes Inc., 19 Mass.App.Ct. 503, 507 (1995); see Third Natl. Bank of Hampden County v. Continental Ins. Co., 388 Mass. 240, 244 (1983). An action for conversion “cannot be maintained without proof that the defendant either did some positive wrongful act with the intention to appropriate the property to himself or to deprive the rightful owner of it, or destroyed the property.” Kelly v. LaForce, 288 F.3d 1, 12 (1st Cir. 2002).
PCM claims that Bodden and Topdot converted PCM customer leads and files. The Court concludes that PCM has proven that Bodden wrongfully appropriated PCM’s documents containing customer lead information, including such information relating to the disputed loans, by taking them to Topdot. In addition, while Topdot might have inadvertently obtained possession of the PCM documents when Bodden came to Topdot, Topdot’s possession became intentional and wrongful after Fasano called Topdot in mid-July, notified it of Bodden’s misappropriation of the documents, and demanded their return. See Atlantic Fin. Corp. v. Galvam, 311 Mass. 49, 50-51 (1942) (“Where a defendant’s possession is not wrongful in its inception, demand and refusal are prerequisites to an action for conversion”).
As the Court has ruled above, PCM has not proven that it was damaged by Bodden’s or Topdot’s wrongful conduct, except with respect to the disputed loans. PCM seeks, as damages for conversion, “the loss of revenues from the loans.” PCM’s Memorandum of Law *591 for Trial, at 5. PCM is entitled to elect either possession of the converted goods (for various reasons, including their supposed disappearance, not an option in this case) or “the value of the converted goods at the time of the conversion, with interest from that time . . .” Welch v. Kosasky, 24 Mass.App.Ct. 402, 404-05 (1987). On the evidence submitted, the Court concludes that the fair market value of the converted customer information relating to the disputed loans is equivalent to PCM’s lost profits from the eight loans as to which it may recover on other theories discussed above. In light of the Court’s findings regarding Bodden’s and Topdot’s respective liability, PCM may recover against Bodden for its lost profits on the eight disputed loans for which he is liable ($39,005), and against Topdot for its lost profits on the Cetoute and Cooper loans (calculated above as $4,737 and $7,542 respectively, for a total of $12,279).
B. Misappropriation of Trade Secrets/ Confidential Information (Count V)
Under the common law and G.L.c. 93, §42, one who misappropriates trade secrets of another is liable for damages caused thereby. Jet Spray Cooler, Inc. v. Crompton, 377 Mass. 159, 168-69 (1979). To prove its claim of misappropriation of trade secrets, PCM must prove that the information sought to be protected is a trade secret, that it took reasonable steps to preserve the secrecy of the information, and that the defendants used improper means to acquire and use the trade secret. Peggy Lawton Kitchens, Inc. v. Hogan, 18 Mass.App.Ct. 937, 939 (1984). “The crucial issue tobe determined in cases involving trade secrets ... is whether the information sought to be protected is, in fact and in law, confidential information.” Jet Spray Cooler, Inc. v. Crompton, 361 Mass. 835, 840 (1972); J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc., 357 Mass. 728, 736 (1970) (“The subject matter of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret.”). There are six factors relevant to this determination:
(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.
Jet Spray Cooler, Inc., 361 Mass. at 840.
Applying these factors to this case, PCM has proven that its customer leads are trade secrets. Customer leads are clearly valuable in the mortgage broker business because they provide the basis for identifying potential customers. As discussed above, PCM spent money developing Bodden’s customer leads by paying for Bodden’s participation in social and business groups, television and radio advertisements, and marketing seminars. Further, PCM treated its customer leads as confidential; only employees with a need to know the information were provided access to the documents. PCM also had a strict policy against customer leads being taken from the office, and so informed its employees. Both the 2003 PCM Agreement and the 2004 PCM Agreement, which Bodden signed, contain a confidentiality provision encompassing “Names, addresses, phone numbers, fax numbers, e-mail addresses, and website addresses in the Company’s client database(s), and any databases subsequently acquired or generated during my employment” and “Names, addresses, phone numbers, fax numbers, e-mail addresses, and website addresses of telemarketing leads and prospect lists.” See Jet Spray Cooler, Inc., 361 Mass. at 840-41 (expectation that any information is to be kept confidential must be “expressed or otherwise brought to the attention" of the party expected to maintain the secrecy of such information).
Having established its claims of conversion as to Bodden (as to the eight disputed loans) and Topdot (as to the Cetoute and Cooper loans), PCM has established the element of improper means on its claims for misappropriation. PCM’s damages as to each defendant are the greater of its lost profits, or those of the defendant, resulting from the misappropriation (see above). See Diomed, Inc. v. Vascular Solutions, Inc., No. Civ.A.03-12498 RWZ, 2006 WL 516756, *1 (D.Mass. March 2, 2006); Curtiss-Wright Corp. v. Edel-Brown Tool & Die Co., 381 Mass. 1, 11-12 (1980); Jet Spray Cooler, Inc. v. Crampton, 377 Mass. 159 (1979).
C. Interference with Contractual Relations/Advantageous Business Relationships (Count VII)
“A defendant may be subject to liability if it intentionally and improperly interferes with an existing or prospective contract between a plaintiff and a third person by inducing or otherwise causing the third person not to perform the contract.” Netherwood v. American Federation of States, County and Municipal Employees, Local 1725, 53 Mass.App.Ct. 11, 21 (2001), citing Restatement (Second) of Torts §§766-67 (1979).[9] To prove interference with either contractual relations or advantageous business relations, the plaintiff has to prove that “(1) he had an advantageous relationship with a third pariy (e.g., a present or prospective contract or employment relationship); (2) the defendant knowingly induced a breaking of the relationship; (3) the defendant’s interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant’s actions.” Blackstone v. Cashman, 448 Mass. 255, 260 (2007), citing Weber v. *592 Community Teamwork, Inc., 434 Mass. 761, 781 (2001); see Netherwood, 53 Mass.App.Ct. at 21.
In assessing whether interference with a contract is improper, the court considers the nature of the conduct, the motive, the interests of the party with which the conduct interferes, the interests sought to be advanced, the social interests in protecting freedom of action and the contractual interests, the proximity or remoteness of the conduct to the interference, and the relations between the parties. Restatement (Second) of Torts §767; see Melo-Tone Vending, Inc. v. Sherry, Inc., 39 Mass.App.Ct. 315, 319 (1995). In addition, there must be “interference accompanied by improper motive or improper means; the plaintiff need not prove both.” Kurker v. Hill, 44 Mass.App.Ct. 184, 191 (1998).
1. Topdot and Bodden’s Interference with PCM’s Customer Relations
PCM argues that Topdot and Bodden interfered with its customer relations or prospective customer relations by soliciting PCM’s customers for business with Topdot and by using stolen documents to do so.
a. Bodden
The Court finds that PCM had advantageous relationships with eight of the customers of the disputed loans[10] and Bodden knowingly induced a breaking of those relationships. Further, PCM was harmed by Bodden’s actions because it lost the financial benefit of those loans. The question, then, is whether Bodden’s actions were “improper in motive or means.” See Bourque v. Cape Southport Assocs., LLC, 60 Mass.App.Ct. 271, 278 (2004) (a party must demonstrate “(s)omething more than intentional interference”); Hunneman Real Estate Corp. v. Norwood Realty, Inc., 54 Mass.App.Ct. 416, 427 (2002) (there must be proof of improper conduct beyond the interference itself).
The motive for Bodden’s actions was clearly financial gain — Bodden’s compensation for closing loans at Topdot was roughly twice his commission at PCM— and there is no evidence that Bodden desired to harm PCM. Motivation of personal financial gain is not enough to satisfy the improper interference requirement. King v. Driscoll 418 Mass. 576, 587 (1994); see United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 817 (1990) (where defendant’s motives were to benefit his customers and himself financially and not to hurt the plaintiff, tortious interference claim could not be sustained); Adcom Products, Inc. v. Konica Business Machines USA, Inc., 41 Mass.App.Ct. 101, 105 (1995) (improper motive consists of a desire to harm the plaintiff).
The improper means required to prove tortious interference must consist of a violation of a statute or the commission of a common-law tort, such as threats, misrepresentations, or defamation. United Truck Leasing Corp., 406 Mass. at 817. As noted above, PCM has established that Bodden’s actions constituted improper means because he used stolen documents to solicit PCM’s customers.
Bodden’s breach of fiduciary duty with regard to the Vasquez loan likewise constitutes improper conduct, but only as to that loan. Bodden breached a fiduciary duty to PCM when he closed Vasquez’s loan for Topdot while he was still employed by PCM. This interference with Vasquez’s relationship with PCM was committed by improper means. See Kurker, 44 Mass.App.Ct. at 191-92 (plaintiffs stated claim for tortious interference where they alleged that defendant’s conduct amounted to a breach of fiduciary duty).
The measure of damages in cases involving business torts such as interference with contractual relations entitles a plaintiff to recover full compensation for his lost profits or requires a defendant to surrender the profits which he realized from his tortious conduct. National Merchandising Corp. v. Leyden, 370 Mass. 425, 430-33 (1976); see Jet Spray Cooler, Inc., 377 Mass. at 169. Thus, PCM may recover from Bodden the greater of its lost profits for the disputed loans ($39,005), or the commissions Bodden received therefrom ($32,384).
b. Topdot
The Court concludes that Topdot also knowingly induced interference with PCM’s relationships with its prospective customers, but only as to the Cetoute and Cooper loans which closed after PCM informed Topdot that Bodden was wrongfully using confidential information he had stolen from PCM. Topdot failed to conduct any investigation after receiving that notice in or just after mid-July, ultimately adopting Bodden’s denial of PCM’s claims. Any reasonable investigation by Topdot would have revealed Bodden’s actions. Because the Court concludes that Topdot knowingly and intentionally failed to investigate PCM’s allegations, the Court concludes that Topdot’s subsequent interference with PCM’s relationships with Cetoute and Cooper was committed by improper means. See Hunneman Real Estate Corp., 54 Mass.App.Ct. at 427 (there must be proof of improper conduct beyond the interference itself).[11]
Topdot received $6,010 in revenue from the Cetoute loan. After subtracting $995 in fees and the $3,009 commission to Bodden, the net to Topdot is $2,006. As to the Cooper loan, the same analysis yields $3,402 ($9,725 in revenue, less $995 in fees and the $5,328 commission to Bodden). Thus, PCM is entitled to recover from Topdot the greater of $5,408, the amount of Topdot’s profit from its improper interference with PCM’s relations with Cetoute and Cooper, or $12,279, the amount of PCM’s own lost profits as to those customers.
2. Topdot’s Interference with PCM’s Contract with Bodden
Bodden entered into the 2004 PCM Agreement, which contained a non-competition clause, and vio *593 lated that clause through his employment at Topdot. Until July 26, 2006, Topdot had no knowledge that Bodden was violating the 2004 PCM Agreement, and thus cannot be said to have knowingly induced a breach of that agreement. After Topdot received the July 26 letter, however, Topdot improperly, and with full knowledge, participated in Bodden’s closing of the Cooper loan on August 26. Thus, as to that loan only, Topdot’s interference with Bodden’s contract with PCM was, while not motivated by other than financial gain, see King, 418 Mass. at 587, “improper in . . . means.” Topdot is thus accountable to PCM for PCM’s profit on that loan.
D. Violation of c. 93A, §2 & 11 (Count VI) 1. Bodden
Claims by an employer against its employee for breach of duty as an employee are not within the scope of chapter 93A. Second Boston Corp. v. Smith, 377 Mass. 918, 918 (1979); see Manning v. Zickerman, 388 Mass. 8, 15 (1983) (disputes arising out of the employment relationship between an employer and employee are not cognizable under chapter 93A). Further, in the circumstances of this case, the violation of a non-compete agreement by a former employee falls outside the scope of chapter 93A regardless of whether that violation occurs during or after the employment relationship, because disputes arising from employment agreements are not in “trade” or “commerce.” Informix v. Rennell, 41 Mass.App.Ct. 161, 162-63 (1996). Cf. Peggy Lawton Kitchens, Inc., 18 Mass.App.Ct. at 940. Thus, PCM’s chapter 93A claim against Bodden fails.
2. Topdot
Topdot cannot be held liable under chapter 93A for Bodden’s breach of the 2004 PCM Agreement. See Oceanair, Inc. v. Katzman, Civil No. 00-3342 (Suffolk Super. Ct. Jan. 22, 2002) (van Gestel, J.) [14 Mass. L. Rptr. 414] (former employer could not sue its former employee’s current employer for a willful breach of a non-compete agreement under c. 93A because the claim arose from the employment relationship); Intertek Testing Servs. v. Curtis-Strauss, Civil No. 98-903 (Middlesex Super. Ct. Aug. 7, 2000) (Gants, J.). But see Professional Staffing Group v. Champigny, Civil No. 04-852A (Suffolk Super. Ct. Nov. 18, 2004) (Sikora, J.) (chapter 93A applied to a former employer’s suit against its former employee’s current employer for violation of a non-compete which occurred well after the termination of the employment relationship, and involved activity in the open marketplace, and not “intra-employment conduct”).
In addition, even though a company that assists a breach of an employee’s fiduciary duty may be liable to his former employer under chapter 93A, see Augat, 409 Mass. at 172, PCM has only shown that Bodden breached a fiduciaiy duty as to the Vasquez loan; there is no evidence that Topdot induced Bodden to commit that breach as Topdot did not know that Bodden was still working for PCM at that time.
There is evidence, however, that Topdot used improper means sufficient to support a tortious interference claim with respect to the Cetoute and Cooper loans (and, separately as to the Cooper loan, with respect to Bodden’s agreement with PCM). The Court must now determine whether Topdot’s actions were unfair or deceptive. “The remedy of businessman against businessman of G.L.c. 93A, §11, may be invoked against an ‘unfair method of competition’ or ‘an unfair or deceptive act or practice . . .’ ” Doliner v. Brown, 21 Mass.App.Ct. 692, 696 (1986). As to “unfair method of competition,” a party would have to be engaged in a “practice considered abusive of, or injurious to competition such as may be discerned in the theft of trade secrets, or in passing off, or in adjacent business torts.” Id. at 696-97. In addition, “[a]n act or practice is unfair within the meaning of G.L.c. 93A if it is: (1) within the penumbra of a common law, statutory, or other established concept of fairness; (2) immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to competitors or other business people.” Morrison v. Toys “R” Us, Inc., 441 Mass. 451, 457 (2004).
Topdot’s actions constituted a tortious interference with an advantageous business relationship. Thus, Topdot’s actions were within a concept of unfairness established at common law. For this reason, the court concludes that Topdot’s actions merit relief under G.L.c. 93A, §11. See Picciuto v. Dwyer, 32 Mass.App.Ct. 137, 139 (1992) (conduct constituting ‘improper purpose or improper means’ can certainly fall far below the acceptable level of fair dealing that chapter 93A was designed to promote). To merit multiple damages under G.L.c. 93A, §11, the unfairness or deception must be willful or knowing. Willful implies not only intent to do an act, but also intent that the act be unfair or deceptive. See Heller v. Silverbranch Constr. Corp., 376 Mass. 621, 627 (1978). Both intent to do an act and intent that the act be unfair are elemental to tortious interference with a contractual or advantageous business relationship. Having concluded that Topdot’s actions were willful and intentional, the Court concludes also that the damages awarded should be doubled, from $12,279 (i.e., the greater of the amounts of damage to PCM against Topdot on the claims of tortious interference) to $24,558. G.L.c. 93A, §11. In addition, PCM is entitled to an award of reasonable attorneys fees and costs. Id.
III. Topdot’s Cross Claim against Bodden
On November 27, 2007, this court (Fabricant, J.) allowed Topdot’s unopposed motion for summary judgment against Bodden regarding indemnification. Thus, Bodden must indemnify Topdot from any liability resulting from any dishonest or fraudulent act of Bodden.
In view of the above findings and rulings, the Court concludes that the liability which Bodden must indemnify is any liability to which Topdot was exposed *594 prior to mid-July of 2006, i.e., before Topdot received actual notice that Bodden had misappropriated PCM’s customer documents. After Topdot received notice of Bodden’s wrongdoing, it was in a position to take steps to end any resulting harm to PCM. As also found above, the only liability to which Topdot is exposed in this case is that which it incurred through its knowing conduct after mid-July. Accordingly, Topdot has not proved that it is subject to any liability as to which Bodden is required to provide indemnification.
IV. Topdot’s Counterclaim against PCM
As stated above, there is no evidence that “People’s Choice Home Loan, Inc.” is connected to PCM in any manner.
To the extent that the parties’ respective requests for findings and rulings are contrary to the foregoing, they are denied.
ORDER FOR JUDGMENT
Upon consideration of the foregoing findings and rulings, it is hereby ORDERED that judgment as to plaintiff PCM’s complaint shall enter as follows.
Count I: For PCM on its Breach of Contract claim against defendant Bodden in the amount of $39,005.
Count II: For PCM on its Breach of the Covenant of Good Faith and Fair Dealing claim against Bodden in the amount of $39,005.
Count III: For PCM on its Breach of Fiduciaiy Duty claim against Bodden in the amount of $3,488.
Count IV: For PCM on its Conversion claim against Bodden in the amount of $39,005, and against defendant Topdot in the amount of $12,279.
Count V: For PCM on its Misappropriation of Confidential Information claim against Bodden in the amount of $39,005, and against Topdot in the amount of $12,279.
Count VI: For Bodden on PCM’s Violation of chapter 93A claim, and for PCM on its Violation of chapter 93A claim against Topdot in the amount of double damages totaling $24,558. In addition, PCM is entitled to an award of reasonable attorneys fees and costs against Topdot, and may serve and file a motion therefor together with supporting affidavit.
Count VII: For PCM on its Interference with Advantageous Business Relationships claim against Bodden in the amount of $39,005, and against Topdot in the amount of $12,279.
With respect to defendant Topdot’s counterclaim against PCM, it is further ORDERED that judgment shall enter for PCM.
With respect to defendant Topdot’s cross claim against defendant Bodden, it is further ORDERED that judgment shall enter for Bodden.

PCM charges Bodden with breach of contract (Count I), breach of the covenant of good faith and fair dealing (Count II), and breach of fiduciaiy duty (Count III), and charges both defendants with conversion (Count IV), misappropriation of confidential information (Count V), violation of c. 93A, sec. 2 and 11 (Count VI), and interference with advantageous business relationships (Count VII).

The latter table sets out the date the loan was “funded,” which for a residential loan lags the closing date by several days (compare, e.g., 4/14/2006 funding date for the Vasquez loan appearing on Ex. 23 with the undisputed closing date— "on or about April 10, 2006" — in PCM proposed finding no. 143). The Court will therefore select, as the “on or about” closing date of a disputed loan, that business day which precedes the loan’s funding date by an intervening three full business days.

Bodden places the date in August. Answer to Interrogatory No. 13.

Bodden places the date in May. Answer to Interrogatory No. 13.

Bodden places the date in June. Answer to Interrogatory No. 13.

PCM states that it “is proceeding on a disgorgement theory of damages against the defendants.” Joint Pre-Trial Memorandum, at 6; see PCM’s “Memorandum of Law for Trial,” at 15-16. While PCM offers authority for that measure of damages as to other counts, see discussion below, it offers no authority for any but the traditional measure of damages on a breach of contract claim.

Although the Court has found that Bodden did not violate his contract with regard to the Quintana loan, the amount of that loan would presumably have been included in Bodden’s monthly total at PCM in determining his commission rate for that month.

“When an employee has executed an enforceable non-compete agreement with his current employer, the ‘active steps’ an employee may take to prepare for competition may constitute a prelude to a breach of that non-compete agreement but they do not constitute a breach of fiduciary duty. Consequently the line that divides permissible preparation from a breach of fiduciary duty is the same for an employee regardless of whether or not he has entered into a non-compete agreement.” National Economic Research Ass'n v. Evans, Civil No. 042618BLS1 (Suffolk Super. Ct. Sept. 10, 2008) (Gants, J.) [24 Mass. L. Rptr. 436].

There are three interference torts: (1) intentional interference with the performance of a contract by a third person, see Restatement (Second) of Torts §766; (2) intentional interference with another’s performance of his own contract, see Restatement (Second) of Torts §766A; and (3) intentional interference with prospective contractual relations, see Restatement (Second) of Torts §766B. The Supreme Judicial Court has “not consistently distinguished” interference torts. Blackstone v. Cashman, 448 Mass. 255, 255 n.9 (2007), citing United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 815 n.6 (1990).

As discussed above, Quintana was a long-time friend of Bodden’s and the Court finds that Quintana was a prospective customer of Bodden’s not PCM’s. Cf. Owen v. Williams, 322 Mass. 356, 361-62 (1948) (“It is well settled that an existing or even a probable future business relationship from which there is a reasonable expectancy of financial benefit is enough” to maintain an action for interference with advantageous business relationships).

 •'■As already noted, a motive of financial gain, standing alone, is not sufficient; companies regularly solicit customers from their competitors in an effort to increase their business. See Doliner v. Brown, 21 Mass.App.Ct. 692, 695 (1986) (“A competitor may ‘interfere’ with another’s contractual expectancy by picking the deal off for himself, if, in advancing his own interest, he refrains from employing wrongful means”).